[S.F. No. 24715. Oct. 21, 1985.]

CHARLES TYREE GREEN, Petitioner, v.
THE SUPERIOR COURT OF ALAMEDA COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

128

## COUNSEL

James R. Jenner, Public Defender, Howard C. Harpham and Michael S. Ogul, Assistant Public Defenders, for Petitioner.

Frank O. Bell, Jr., State Public Defender, and Julia Cline Newcomb, Deputy State Public Defender, as Amici Curiae on behalf of Petitioner.

No appearance for Respondent.

John K. Van de Kamp, Attorney General, Thomas A. Brady, Martin S. Kaye, Ronald A. Bass and Dane R. Gillette, Deputy Attorneys General, for Real Party in Interest.

## OPINION

KAUS, J.*—Petitioner Charles Tyree Green (defendant) seeks writ review of a trial court ruling which denied his motion to suppress (1) statements he made to police officers on February 16, 1982, (2) his work coveralls that were seized on that date, and (3) confessions allegedly obtained as a result of the earlier statements and seizure of the coveralls. (Pen. Code, § 1538.5, subd. (i).) He contends that the coveralls were the product of a custodial interrogation without *Miranda* warnings (*Miranda* v. *Arizona* (1966) 384

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) or, alternatively, that they were the product of an illegal detention or arrest.

Defendant is charged with the robbery and murder of Harold Golden on February 11, 1982. (Pen. Code, §§ 211, 187.) He is also alleged to have committed the murder during the commission of a robbery, a special circumstance under the 1978 death penalty law. (Pen. Code, § 190.2, subd. (a)(17)(i).)

At the hearing on the motion to suppress, Sergeant Michael Sitterud, the lead investigating officer, testified that on February 14, 1982, Golden's body was found in the trunk of his car by two relatives. His wife had reported him missing after he failed to return home from work on February 11. According to the missing person report, Golden worked at the toll booth in a garage on Clay Street in Oakland, giving out tickets and collecting money. Apparently the last person to have seen him was defendant, who worked as a janitor at the garage. Defendant said Golden was still there when he left the garage about 8 p.m. on February 11.

On the morning of February 15, Sitterud met with Carl Ivey, the manager of the garage and a retired police officer. Sitterud spoke with Ivey at the police station in one of the interview rooms. Ivey told him that Golden's duties included depositing the day's receipts at the bank and that the receipts from February 11 were missing. The amount would have been between $300 and $700. Ivey also told Sitterud that defendant worked as a janitor at both the Clay Street garage and a garage on Franklin Street and that he was not scheduled to be back at work until February 16. According to Ivey, Golden had not trusted defendant. Defendant made $5.75 an hour and had recently bought a used car.

Later that day Ivey called to report that he had found some of Golden's property, an empty money box, a bank deposit bag and possibly the murder weapons—a pipe and a knife—in a dumpster at the garage. In the afternoon Sitterud learned from the autopsy that Golden had died from blunt trauma to the head and stab wounds in the chest and back. Sitterud and his partner Sergeant Vargas then searched the first floor of the garage for signs of blood. Aside from a minute speck of what might have been blood in the supply area, they found no evidence establishing the scene of the killing.

On February 16, Sitterud arranged with the crime lab to spray the garage with flourinol or luminol, a process which reveals blood traces otherwise not visible. He was to meet the technicians at the garage at 6 p.m. At noon on February 16, Sitterud spoke with Ivey by phone. Ivey told him that Norma Snead, a resident of a nearby apartment building, had been in the

garage about 7:30 p.m. on February 11. The conversation between Sitterud and Ivey was very brief.

Sitterud and Vargas—wearing plain clothes and driving an unmarked car—went to the garage about 4:15 p.m. on February 16. They told Ivey they wanted to talk to defendant, who was scheduled to start work at 4:30 p.m. After Ivey pointed out defendant, Sitterud walked up to him, introduced himself and said he was investigating Golden's disappearance. He asked defendant to accompany him to his office for an interview and said "if at any time he needed to come back, we'd drive him back, not to worry about a ride."

Sitterud considered defendant to be a very important witness because he was the last person to have seen Golden and was familiar with the day-to-day operations at the garage. He did not view defendant as a suspect at that time or during the initial interviews. For that reason no *Miranda* warnings were given.

Sitterud and Vargas took defendant to one of the interview rooms at the station. These were the same rooms which had been used to interview Ivey and Golden's relatives who had found his body. The rooms are 7 by 12 feet, have no windows and require a key to enter or exit. Sitterud said he routinely conducts witness interviews in these rooms since there is no other appropriate location.

The initial interview with defendant began at 4:35 p.m. and continued until 5:30 p.m., when the officers told defendant they wanted to take a taped statement and asked him "to mentally review the time frames" while they were getting the equipment. Using notes from the first interview, they took a more detailed taped statement. This interview lasted from 5:50 p.m. to 6:25 p.m., at which time the officers said they were late for a meeting and asked defendant if he would wait for them because they might have some more questions. Defendant agreed and remained in the interview room while Sitterud and Vargas went to the garage to meet the crime lab technicians. Sitterud said it was not unusual to ask witnesses to wait like this and that the interview rooms were the only appropriate place for them to stay. Sitterud asked Lieutenant Green to take care of defendant's needs while they were gone.[1] Sitterud testified that he did not know whether defendant was aware that the interview room was locked. He also said he would have let defendant go if he had not wanted to wait.

---

[1]Lieutenant Green testified that he would have checked with Sitterud if defendant had indicated he had wanted to leave the interview room.

The interviews with defendant consisted of detailed questions by Sitterud and Vargas regarding the garage operations, Golden's habits, defendant's relationship with Golden, his actions on the 11th, when he left that night, the clothes he was wearing, and other information about defendant's personal life. The questions were detailed but not accusatory. After the initial offer to drive him back to the garage whenever he wanted, defendant was never told he was free to leave.

Sitterud spoke with Ivey when he arrived at the garage around 6:45 p.m. Ivey told him that when Norma Snead had been at the garage at 7:30 p.m. on February 11, the lights were out and no one was there. This contradicted defendant's statement that he had left at 7:50 p.m., that the lights were then on and Golden was in the booth. Ivey also told Sitterud that at 4:15 p.m. that day defendant had brought in the coveralls he usually wore at work and that they were in the supply area—an area surrounded by a cyclone fence, where cleaning supplies were kept. The area was unlocked at the time, although it was locked at times.

Sitterud decided he would like to examine the coveralls for blood. About 6:50 p.m.—25 minutes after he had left defendant—he called Lieutenant Green to ask him to ask for defendant's permission to examine the coveralls. Green did so and reported that defendant had said to go ahead. Sitterud went to the unlocked supply area and examined the coveralls. They were in plain sight on top of a box. He found obvious traces of blood on them, though they had been diluted with water.[2] At this point, according to Sitterud, defendant became a suspect.

Sitterud talked to Norma Snead who confirmed that she had been in the garage between 7:15 and 7:30 p.m. on February 11. She was certain the lights were out, the gate locked, and neither defendant nor the victim present.

In the meantime, the technicians had found traces of blood in the basement of the garage. The results of the flourinal spraying were dramatic, revealing streaks where the floor had been mopped and the walls washed off. A pool of blood was found under a trailer wheel.

Sitterud said that if defendant had not consented to the examination of his coveralls, he would have left them where they were and continued with the investigation by the crime lab technicians. However, after the technicians

---

[2]It is not clear from the record whether it was necessary for Sitterud to pick up or move the coveralls in order to see the blood. He was asked what he saw when he "looked at the coveralls." He replied, "I saw what I recognized as obvious blood. . . . It was traces of blood that had been actually diluted with a lot of water. The legs were still damp."

found what appeared to be the crime scene, he would have seized the coveralls without a warrant or defendant's consent. He knew where the coveralls were and that they were defendant's.

Sitterud and Vargas went back to the office at 10:15 p.m., gave defendant *Miranda* warnings, obtained a waiver and interrogated him. At that point defendant was under arrest. He confessed to the robbery and murder of Golden after being confronted with the evidence of the blood on his coveralls and the discrepancies between his time frames and those of Norma Snead.

Defendant did not testify at the suppression hearing.

In denying the motion to suppress, the superior court expressly found "quite believable" Sitterud's testimony that defendant was not a suspect during the initial interviews. Although in hindsight suspicion might have been focused on defendant earlier, Sitterud had other cases going at the time and was only in the initial stages of investigation in this case. The court found that the initial interviews were not custodial interrogation and that defendant was free to leave at any time before his actual arrest.

I

 Defendant's principal contention is that the initial interviews were custodial, that *Miranda* warnings should have been given and that everything else was a product of that illegality, because he never would have consented to the seizure of the coveralls, had he been told of his rights.[3] *Miranda* warnings are, of course, required before a person is subjected to a "custodial interrogation," which is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." (*Miranda* v. *Arizona, supra,* 384 U.S. at p. 444 [16 L.Ed.2d at p. 706].) We adopted this definition in *People* v. *Arnold* (1967) 66 Cal.2d 438, 448 [58 Cal.Rptr. 115, 426 P.2d 515], even though *Arnold* was a pre-*Miranda* case governed by *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758] and *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]. We stated that "custody occurs if the suspect is physically deprived of his freedom of action in any way or is led

---

[3]We review defendant's *Miranda* claim because it is urged as the basis for suppressing the coveralls as an alleged product of that illegality. A ruling on the legality of a confession or admission is only subject to pretrial appellate review when it is inextricably intertwined with a Penal Code section 1538.5 motion to suppress evidence. (*People* v. *Superior Court (Zolnay)* (1975) 15 Cal.3d 729, 733-734 [125 Cal.Rptr. 798, 542 P.2d 1390].)

to believe, as a reasonable person, that he is so deprived." (66 Cal.2d at p. 448.)

In *Arnold,* the defendant was convicted of the manslaughter of her 13-year-old daughter, Sandra, primarily on the basis of a statement she had given concerning the details of her daughter's admittedly grave illness and her reliance on faithhealing rather than medical help. The statement was given during an interrogation by a deputy district attorney: "The deputy had notified her to come to his office to discuss the circumstances of Sandra's death. She did so; she testified at trial, 'I didn't know I didn't have to come down and talk to you, or I wouldn't have . . . .' The deputy queried her for one hour and forty-five minutes. . . . At this point defendant had not been placed under arrest." (66 Cal.2d at p. 444.)

We held in *Arnold* that the prosecution had failed to sustain its burden of showing that the defendant was not in custody at the time she made her statement. In light of her testimony that she did not know she could refuse to appear, "she might reasonably have believed that if she had attempted to leave during the course of the interrogation the deputy district attorney would have arrested her or told police officers to physically detain her." (66 Cal.2d at p. 449.) Since an erroneous ruling by the trial court had thwarted development of a full record on the point, we remanded with directions to focus on the precise language used by the deputy in summoning the defendant to his office, the physical surroundings, the extent to which the defendant may have been confronted with evidence of her guilt and any other circumstances which might have led her reasonably to believe that she could not leave freely.

Since *Arnold,* countless decisions have dealt with the question of what constitutes a custodial interrogation for *Miranda* purposes. (See, e.g., Annot., Custodial Interrogation—Miranda Rule (1970) 31 A.L.R.3d 565.) The United States Supreme Court recently again turned its attention to this question in *California* v. *Beheler* (1983) 463 U.S. 1121 [77 L.Ed.2d 1275, 103 S.Ct. 3517]. There, the defendant called the police to report that his half-brother had murdered someone and had hidden the gun in Beheler's backyard. A consent search of the yard revealed the gun. Later that evening Beheler agreed to accompany police to the station. The police had specifically told him that he was not under arrest. At the station he was interviewed about the murder. The interview lasted about 30 minutes. Beheler left after being told that his statement would be evaluated by the district attorney. He was arrested five days later and was convicted of first degree murder on an aiding and abetting theory. The United States Supreme Court reversed the California Court of Appeal's determination that the interview at the station was a "custodial interrogation" which required *Miranda* warnings. The

high court found the case indistinguishable from *Oregon* v. *Mathiason* (1977) 429 U.S. 492 [50 L.Ed.2d 714, 97 S.Ct. 711], which had held that Mathiason was not "in custody" within the meaning of *Miranda* when he agreed to come to the police station for an interview which occurred after he was informed that he was not under arrest, that he was suspected of having committed a burglary and that any statement he made would be evaluated by the district attorney. The officer falsely informed Mathiason that his fingerprints had been found at the crime scene. Mathiason then admitted his participation in the burglary, was given *Miranda* warnings, and made a taped confession. The interview lasted 30 minutes. He was released pending the district attorney's determination whether to bring charges.

The defendants in both *Beheler* and *Mathiason* were suspects at the time they agreed to come to the police station for interviews.[4] The court acknowledged the coercive aspects inherent in any questioning by a police officer, but rejected the idea that a "coercive environment" is itself sufficient to require *Miranda* warnings: "Although the circumstances of each case must certainly influence a determination of whether a suspect is 'in custody' for purposes of receiving *Miranda* protection, the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." (*California* v. *Beheler, supra,* 463 U.S. at p. 1125 [77 L.Ed.2d at p. 1279].)[5]

Several factors distinguish this case from *Beheler* and *Mathiason*. On the one hand, defendant was not a suspect when he was asked to come to the station.[6] On the other, the interviews here were an hour and a half longer, defendant was never expressly told he was not under arrest, and the interviews took place in a locked room. The record, however, does not reveal whether defendant realized the room was locked. Although defendant presented some evidence at the suppression hearing, we do not have the benefit of his version on whether he thought he was free to leave. Sitterud

---

[4]The court noted that it had earlier rejected the notion that the "in custody" requirement was satisfied merely because the police interviewed a person who was the "focus" of a criminal investigation: "We made clear that '*Miranda* implicitly defined "focus" . . . as "questioning initiated by law enforcement officers *after* a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."'" (*California* v. *Beheler, supra,* 463 U.S. at p. 1124, fn. 2 [77 L.Ed.2d at p. 1279].)

[5]The test, of course, is an objective one—"how a reasonable man in the suspect's position would have understood his situation." (*Berkemer* v. *McCarty* (1984) 468 U.S. 420, 442 [82 L.Ed.2d 317, 336, 104 S.Ct. 3138].) Would such a person feel that he has been subjected to restraints comparable to those associated with a formal arrest? If so, he was "in custody" and entitled to *Miranda* warnings before being interrogated.

[6]Despite defense counsel's vigorous attempts to undermine Sitterud's testimony that he did not view defendant as a suspect, the record supports the trial court's finding that his testimony was "quite believable." Moreover, even if defendant had been a suspect, that fact would not be determinative on whether he was "in custody." (See fn. 4, *ante.*)

testified that before he saw the blood on defendant's coveralls, he would have released defendant at any time he had wanted to be released.

Although the question is close, we conclude that the interviews in this case were not "custodial interrogation" as that term has been defined in *Miranda, Beheler* and *Mathiason.* The trial court expressly found Sitterud's testimony believable, and the record supports that finding. Notwithstanding the lock on the interview room door, the evidence does not compel the conclusion that defendant could not have left whenever he had wanted during the interview. In sum, the record supports the trial court's implied finding that a reasonable person in defendant's position would not have felt that he was "in custody" and restrained from departing at will.

## II

■ Defendant contends that even if *Miranda* warnings were not required for the initial interview, the coveralls and confession must be suppressed as products of his illegal detention while he was left alone in the locked interview room when Sitterud went to the garage to supervise the crime lab technicians. The complexion of defendant's stay changed, in our view, when he was left alone in the interview room. It is one thing for him to have been sitting in the locked room talking to two people who had indicated they would take him back to the garage whenever he wanted. But it is an entirely different matter when a person is left alone in that locked room with no apparent or ready means of leaving. Moreover, Lieutenant Green's testimony indicated that he would not have let defendant leave during that period—even to go to the bathroom—without having first checked with Sitterud. (See fn. 1, *ante.*) Accordingly, we conclude that defendant was unlawfully "in custody" during that period. Nevertheless, it does not follow that the ruling denying the suppression motion must be reversed.

■ The record in this case provides full factual support for application of the doctrine of "inevitable discovery." (See *Nix* v. *Williams* (1984) 467 U.S. 431 [81 L.Ed.2d 377, 104 S.Ct. 250]; *People* v. *Superior Court (Tunch)* (1978) 80 Cal.App.3d 665, 671-683 [145 Cal.Rptr. 795]; see also *People* v. *Ditson* (1962) 57 Cal.2d 415, 442-444 [20 Cal.Rptr. 165, 369 P.2d 714].) Before Sitterud obtained defendant's consent to examine the coveralls, he had already learned from Carl Ivey that defendant had brought in the coveralls he usually wore and had put them in the supply area. The coveralls were lying on a box in plain view there. Sitterud testified that although he would not have seized the coveralls at that precise moment had defendant not consented, he would have seized them without a warrant or consent after the technicians had determined that the garage was the scene of the crime. He was, of course, conducting a lawful search of the garage

and did not need defendant's permission to enter the unlocked supply area where the coveralls were in plain view and subject to seizure as evidence. (See *Texas* v. *Brown* (1983) 460 U.S. 730, 741 [75 L.Ed.2d 502, 513, 103 S.Ct. 1535, 1542]; *Guidi* v. *Superior Court* (1973) 10 Cal.3d 1, 15-19 [109 Cal.Rptr. 684, 513 P.2d 908]; *People* v. *Hill* (1974) 12 Cal.3d 731, 755-756 [117 Cal.Rptr. 393, 528 P.2d 1].) Since the coveralls inevitably would have been seized lawfully a short time later, "there is no nexus [to the illegality] sufficient to provide a taint." (*Nix* v. *Williams, supra,* 467 U.S. at p. 448 [81 L.Ed.2d at p. 390].) Indeed, since the police officers obtained from defendant no information they did not already have, and the consent they did obtain was legally unnecessary, it might be said that there was no nexus at all.[7]

In the trial court, inevitable discovery was only passingly urged as a theory of admissibility.[8] Although we have many times refused to allow the prosecution to assert a new theory on appeal to support or defeat the trial court's suppression ruling, those cases were premised on considerations not present here. In *People* v. *Superior Court (Simon)* (1972) 7 Cal.3d 186, 197-199 [101 Cal.Rptr. 837, 496 P.2d 1205]; *People* v. *Miller* (1972) 7 Cal.3d 219, 225-226 [101 Cal.Rptr. 860, 496 P.2d 1228]; *Mestas* v. *Superior Court* (1972) 7 Cal.3d 537, 542 [102 Cal.Rptr. 729, 498 P.2d 977]; and *People* v. *Smith* (1983) 34 Cal.3d 251, 269-271 [193 Cal.Rptr. 692, 667 P.2d 149], we prohibited the People from justifying arrests on grounds which did not occur to the arresting officers at the time of the arrest. (See also *Agar* v. *Superior Court* (1971) 21 Cal.App.3d 24, 28-32 [98 Cal.Rptr. 148].) The obvious reason for that rule is to prevent "hunch" arrests on the street, based on nothing more than confidence that a smart prosecutor will discover a legal basis in the courtroom.[9] That rationale falls by the wayside in an inevitable discovery case, where the illegality of the police conduct which led to the actual seizure is assumed.

In other cases, such as *Lorenzana* v. *Superior Court* (1973) 9 Cal.3d 626, 640-641 [108 Cal.Rptr. 585, 511 P.2d 33], the People's new theory was not supported by the record made at the first hearing and would have ne-

---

[7]Therefore, we have no occasion to consider the proper scope of the "inevitable discovery" doctrine in other contexts under either the federal or state Constitutions.

[8]Although the parties argue the applicability of the inevitable discovery doctrine in their appellate briefs, they made only oblique reference to that doctrine at the suppression hearing. Both sides' questioning of Sitterud about the operative facts for the inevitable discovery theory indicates that its potential applicability was at least in the air. The most direct reference was made by the prosecutor during final argument on the voluntariness of defendant's consent to examine the coveralls: "I think under *James* in 19 Cal.3d, this is clearly a free and voluntary consent *and in any event, they would have gotten it anyway.*" (Italics added.)

[9]One rarely hears of the cases where the confidence in the prosecutor's legal agility was misplaced.

cessitated the taking of considerably more evidence, thus thwarting Penal Code section 1538.5's purpose of avoiding continued relitigation of admissibility questions. In still other cases the defendant had no notice of the new theory and thus no opportunity to present evidence in opposition. (See, e.g., *People* v. *Adam* (1969) 1 Cal.App.3d 486, 489 [81 Cal.Rptr. 738]; *Reinert* v. *Superior Court* (1969) 2 Cal.App.3d 36, 42 [82 Cal.Rptr. 263]; see also *Giordenello* v. *United States* (1958) 357 U.S. 480, 487-488 [2 L.Ed.2d 1503, 1510, 78 S.Ct. 1245].)

■ The present case does not suffer from those problems. The evidence supporting the plain view/inevitable discovery theory was fully developed by both the prosecution and the defense. Defendant had an opportunity to cross-examine and, indeed, did cross-examine Sitterud regarding the facts supporting this theory.[10] Thus defendant does not appear to have been prejudiced by any lack of formal notice. The factual basis for the theory is fully set forth in the record, and it does not appear that any further evidence could have been introduced to suggest that Sitterud lacked probable cause to inspect and seize the coveralls without a warrant or consent.

To close our eyes to the clear applicability of the inevitable discovery doctrine would run contrary to the settled principle of appellate review that a correct decision of the trial court must be affirmed on appeal even if it is based on erroneous reasoning. (See *Davey* v. *Southern Pacific Co.* (1897) 116 Cal. 325, 329 [48 P. 117]; *People* v. *Grana* (1934) 1 Cal.2d 565, 571 [36 P.2d 375]; *D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 19 [112 Cal.Rptr. 786, 520 P.2d 10]; *People* v. *Braeseke* (1979) 25 Cal.3d 691, 701 [159 Cal.Rptr. 684, 602 P.2d 384] [reiterated 28 Cal.3d 86 (168 Cal.Rptr. 603, 618 P.2d 149)]; *People* v. *Towner* (1968) 259 Cal.App.2d 682, 685 [66 Cal.Rptr. 559]; Witkin, Cal. Criminal Procedure (1963) Appeal, § 682, pp. 665-666; 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 226, pp. 4215-4216.) This principle was not discussed in the previously mentioned cases. Moreover, since this principle comes into play only in sustaining a ruling, it would not, of course, have been relevant in cases in which a party was seeking to reverse a ruling on a newly asserted ground. (See, e.g., *People* v. *Smith, supra,* 34 Cal.3d at pp. 269-272.)

When, as here, the record fully establishes another basis for affirming the trial court's ruling and there does not appear to be any further evidence that

---

[10] Defendant specifically cross-examined Sitterud about key elements of this theory: (1) access to the storage area where the coveralls were lying, and (2) whether Sitterud would have seized the coveralls without a warrant had defendant refused permission for their examination.

could have been introduced to defeat the theory,[11] we hold that the failure to have urged the theory below does not preclude our reliance on it to affirm the trial court's ruling.

The alternative writ is discharged, and the peremptory writ is denied.

Grodin, J., concurred.

**LUCAS, J.**—█ █ █ I concur with the majority's conclusion that defendant was not "in custody" during his interview and with the ultimate holding that the alternative writ should be discharged and the peremptory writ denied. However, I part company from my colleagues on the way to the final result.

I do not believe that defendant was unlawfully in custody at the time he consented to the search of his coveralls. The trial judge unequivocally found the testimony presented supported the conclusion that defendant "was free to leave at any time he indicated he wished to, prior to his formally being placed under arrest . . ." and I agree. The majority's finding of unlawful detention rests upon its perception of an amorphous "change" in the "complexion of defendant's stay . . . when he was left alone in the interview room. It is one thing for him to have been sitting in the locked room talking to two people who had indicated they would take him back to the garage whenever he wanted. But it is an entirely different matter when a person is left alone in that locked room with no apparent or ready means of leaving." (*Ante,* p. 136.) The majority further cites testimony of Lieutenant Green, who apparently had never met defendant before he requested his consent on behalf of Officer Sitterud, that he would not have permitted defendant to leave the room without first checking with Sitterud.

The record shows that Sitterud and his coinvestigator left defendant to keep an appointment with laboratory technicians at the garage. The meeting had been planned before defendant was asked to accompany the officers and before he was interviewed. Thus, the discussions with defendant did not generate Sitterud's interest in further testing at the garage. When the officers departed for their appointment they were already late, and defendant was left where he had been interviewed as a matter of convenience. Nothing

[11]If, however, defendant thinks there is evidence he could present to contradict the inevitable discovery theory, he could, of course, seek to invoke the provisions of Penal Code section 1538.5, subdivision (h) for a suppression motion at trial upon a showing of good cause why prior to trial the opportunity to make this motion did not exist or why he was not aware of the grounds for the motion. (See *People v. Superior Court (Edmonds)* (1971) 4 Cal.3d 605, 611 [94 Cal.Rptr. 250, 483 P.2d 1202].)

about his environment was altered; he was simply in the same room but on his own awaiting the return of the officers to continue their discussion.

When defendant originally arrived at the station he was taken to a room adjoining a general office area containing the desks of Sitterud and 17 other investigating officers. Sitterud testified that interviews generally were not held in the outer area because of noise and distraction and because the various desks often contained sensitive information regarding cases under investigation. It was therefore not usual practice to allow witnesses or suspects to remain there or to perform interviews there. On the other hand, witnesses were frequently left in interview rooms where they would be available during an officer's field investigation or simply to accommodate an officer's schedule.

In regard to defendant, Sitterud testified he had several reasons for wishing him to wait in the interview room. Sitterud intended to speak with other possible witnesses and wanted defendant accessible so that he could then correlate information received from others with defendant's recollection. Moreover, defendant was a janitor at the garage, and Sitterud did not wish him present when laboratory tests were performed both because he did not want extraneous people around and because defendant's resumption of his duties at the garage could have interfered with the investigation.

Sitterud therefore "*asked* [defendant] if he would wait for us at the office." (Italics added.) He told defendant he would be gone a "short time" and explained he was leaving for an appointment for which he was already late. Defendant was left with newspapers to read, and on his way out Sitterud informed Lieutenant Green that defendant was a witness and asked Green to attend to his needs. Lieutenant Green stated he would have checked with Sitterud before permitting defendant to leave the interview room in order "to determine his status." The situation did not arise because defendant never sought to leave, and Green did not speak to defendant until he sought his consent. Sitterud, who was in charge of the investigation, testified specifically that if, at the time he left to return to the garage, defendant had asked to leave, he would have let him do so.

Officer Sitterud's request for permission to examine the coveralls came only 15 to 20 minutes after he had left defendant. At that point he had spoken with another person who described a time frame for the last evening that the victim was seen which sharply differed from that offered by defendant. The garage manager told Sitterud that defendant had brought his coveralls to work that day, and the officer then decided to check them to see whether they bore on the investigation.

Once one concludes that the initial interview did not involve unlawful custody, I see no basis to find that the *departure* of the officers here somehow transformed the situation into an unlawful one. Both before and after the departure of the officers defendant would have had to ask for assistance in leaving the room: before, by requesting Sitterud or his partner to unlock the door; after, by knocking in order to have Lieutenant Green let him out. Defendant was not moved from the place where the interview had occurred. He was asked if he would wait and the reasons for the delay were explained to him. These reasons were totally credible in view of the progress of the investigation. If anything, the action of the officers in leaving defendant alone, unbooked and apparently unsearched,[1] in the same room in which they had interviewed him, supports the conclusion that defendant's presence continued to be noncustodial. Nothing significant occurred to make the departure of the officers change the nature of defendant's situation.

Because I do not believe defendant was in illegal custody at the time the officers left, I do not find it necessary to inquire into the application of the "inevitable discovery" rule. I would instead conclude that the consent was freely and properly given under the facts and circumstances of this case, and end the consideration there.

One final note. I do not intend to imply that officers who *have* focused upon a suspect but do not yet have sufficient cause to arrest may cavalierly leave the suspect in a locked room in an attempt improperly to impress on him the weight of their authority while they pursue their investigation. However, such was not the case here, where the record demonstrates that the officers, until they returned to the garage, viewed defendant only as a helpful witness whom they wished to have available as a significant "reference point" while they investigated. Had the officers been interviewing the bereaved widow at the time they had to leave for their appointment, I suspect their conduct would have been the same as it was here. They would have asked if she were willing to wait, and if she agreed, would have left her just as they left defendant.

I cannot find that the officers acted improperly here. The circumstances of defendant's tenure in the interview room take on a suspicious cast only because he ultimately turned out to be the suspect. When defendant remained in the room it was understood by all that he was a witness rather than a suspect and his presence was a result of cooperation and not coercion. His consent sufficed to authorize the search. Had the search and subsequent

---

[1] Defendant, it should be noted, was transported to the station in the back seat of an unmarked police car which had no barrier between front and back and had fully functional back doors which an occupant could open at will.

tests not revealed what they did, the officers apparently would have returned and resumed their interview, taking up where they had left off.

Mosk, J., concurred.

**BIRD, C. J.,** Concurring and Dissenting.—I write separately because the majority opinion uses the wrong standard to define custody. Traditionally, California courts have used the *Arnold* standard. (See maj. opn., *ante,* at p. 133.) I find no principled reason to abandon that precedent.

Further, it is unseemly to see this court strain to reach the issue of "inevitable discovery" when it is both unnecessary and inappropriate. The overalls were admissible because they were discovered and seized independently of the un*Mirandized* statement. Why should this court speculate about whether *they might have been* so discovered and seized?

This is not an inevitable discovery case. The overalls were already discovered. No fancy inevitable discovery theories are needed to break the chain between the consent and the seizure. The overalls were found as a result of the investigation at the garage. They were not seized as a result of any earlier illegalities by the police.

It is unfair to the parties to adopt such a slippery doctrine as inevitable discovery when the facts do *not* present the issue, and the theory was not argued below.

Broussard, J., and Reynoso, J., concurred.

Petitioner's application for a rehearing was denied November 27, 1985. Reynoso, J., was of the opinion that the application should be granted.