[No. F034993. Fifth Dist. Nov. 22, 2000.]

FRESNO UNIFIED SCHOOL DISTRICT, Petitioner, v.
WORKERS' COMPENSATION APPEALS BOARD and DANIEL
HUMPHREY, Respondents.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I.B.5, I.C., I.D and II.

**COUNSEL**

Klein, Testan & Brundo and Jane Woodcock for Petitioner.

No appearance for Respondent Workers' Compensation Appeals Board.

Cole, Fisher, Bosquez-Flores, Cole & O'Keefe and C. Jeffrey Fisher for Respondent Daniel Humphrey.

**OPINION**

**DIBIASO, Acting P. J.**—In the published portion of this opinion, we construe certain language in Labor Code section 4750.5. We hold, first, that the phrase "unrelated noncompensable injury" means a disabling event which, had it been work related, would be compensable under the worker's compensation laws, and, second, that the word "solely" was intended to incorporate the existing rules applicable to the apportionment of successive disabilities.

### SUMMARY OF PROCEEDINGS BELOW

Respondent Daniel Humphrey was employed as a custodian for petitioner Fresno Unified School District (FUSD) between September 15, 1982, and August 20, 1997. On August 19, 1997, Humphrey sustained an injury to his lower back while moving a heavy freezer. During his employment, he also suffered a cumulative trauma injury to his neck, spine, left minor shoulder and bilateral upper extremities. On August 21, 1997, Humphrey suffered a nonindustrial heart attack. Humphrey did not return to work and, on September 24, 1997, filed two claims for compensation (one for each industrial injury) with respondent Workers' Compensation Appeals Board (WCAB).

FUSD admitted the two work-related injuries. The matter proceeded to trial for a determination of the amount of disability indemnity owed. FUSD

claimed Labor[1] Code sections 4750.5, 4750 and 4663 were applicable, requiring apportionment of the disability between the industrial injuries and the nonindustrial injuries (Humphrey's heart attack and two previous automobile accidents.) A trial was held before a workers' compensation administrative law judge (WCJ) on June 11, 1999. The WCJ, in an opinion, findings and award filed on November 18, 1999, determined in part that:

1. Humphrey suffered total temporary disability from his industrial injuries between August 21, 1997, and January 1, 1998;

2. Humphrey suffered permanent disability beginning January 2, 1998, to the extent of 71 percent; and,

3. Apportionment, under section 4663 or section 4750.5, to prior disability, to the subsequent heart condition, or to an underlying disease process, was not appropriate.

FUSD filed a timely petition for reconsideration with the WCAB on December 9, 1999. Consistent with normal WCAB practice, the WCJ filed his report on the petition for reconsideration on December 23, 1999, further explaining the award and recommending that FUSD's petition be denied.

On January 12, 2000, the WCAB denied the petition, stating: "We have considered the allegations of the Petition for Reconsideration and the contents of the report of the workers' compensation administrative law judge . . . with respect thereto. Based on our review of the record, and for the reasons stated in said report which we adopt and incorporate, we will deny reconsideration."

Thereafter, on February 16, 2000, FUSD filed a petition for writ of review in this court. On June 23, 2000, we ordered that the writ issue.

STATEMENT OF FACTS

*Work Injuries*

Humphrey's work as a custodian for FUSD included strenuous physical labor, such as waxing and mopping floors, yard maintenance and moving furniture, dining room tables, book cases, file cabinets and freezer equipment.

It is undisputed that, in the course of his employment, Humphrey sustained two distinct injuries subject to workers' compensation—the cumulative back and neck injury and the back injury that occurred on August 19,

---

[1]All statutory references are to the Labor Code unless otherwise indicated.

1997. The cumulative back injury was manifested by Humphrey's history of complaints about several episodes of lower back pain which gradually worsened through the years. He had suffered periods of temporary disability, sometimes lasting four or five weeks, followed by full recovery. Over the years he learned to "baby" his back more and more. Treatment varied from chiropractic therapy, through care by the "company" doctor, Dr. Sutton, to self-care with heat, rest or Motrin. Orthopedic surgery was discussed and recommended but never performed. As early as 1994, X-rays reflected severe degeneration at multiple disc and facet levels, which Humphrey's neurologist, Dr. Stavropoulos, believed to be cumulative in origin and most likely the result of repeated work injuries sustained by Humphrey as a laborer and custodian.

In addition to his orthopedic injuries, Humphrey was diagnosed as having both bilateral carpal tunnel syndrome and bilateral ulnar neuropathy. Both were determined to be work-related injuries. As a result, Dr. Stavropoulos reported Humphrey would "do poorly with rapid, repetitive motions of the hands, repeated grasping and gripping activities as well as working with his wrists in a flexed position."

Humphrey described his injuries as causing pain in his left shoulder and shoulder blade and down his arm into his fingers. He said the pain, a dull ache, was "pretty frequent," although it "comes and goes." In addition, he said he experienced numbness and tingling in his hands.

*Prior Injuries*

Before the work-related back injury on August 19, 1997, Humphrey had been involved in two nonwork-related automobile accidents. The first, on August 27, 1994, caused injury to Humphrey's neck, back and both shoulders. He received physical therapy, chiropractic treatment, and a settlement of $15,000. All symptoms were resolved by March 1995, when he was released from medical care. Humphrey missed six to eight weeks of work before returning without restriction.

The second automobile accident, on September 10, 1996, caused injuries to Humphrey's neck, back and shoulder. The accident was relatively minor, with no serious physical damage to Humphrey's vehicle. He missed approximately eight to nine weeks of work. Humphrey was able to return to work without restriction in December 1996 and without any prospective need for surgery. Prior to the 1996 accident, Humphrey had no complaints of symptoms in his back, neck or shoulders. After the accident, he experienced pain in his neck, back and shoulder. The numbness and tingling in his hands started after the September 1996 accident and continued.

On February 14, 1997, Humphrey saw Dr. Brett Sullivan, a chiropractor and an independent medical examiner, in connection with the September 1996 auto accident. Humphrey was still complaining of stiffness, soreness, and decreased movement from his left neck to his left medial scapular region. Dr. Sullivan reported: "The patient has significant degenerative changes in his cervical spine, along with a blocked vertebrae, which would cause restriction in motion by itself. The lumbar spine was either not examined or was within normal limits. After reviewing the objective findings and the previous symptom complex, it is my opinion [that] Mr. Humphrey sustained, at most, a mild Grade 1 musculotendeness [sic] type of injury as a result of the motor vehicle collision which occurred on 09/10/96. This is based on my current examination findings, the previous examination findings, the mechanism of injury, the subjective complaints and other objective findings."

Dr. Sullivan further opined that Humphrey had sustained a minor injury to his cervical spine and left shoulder, which constituted an exacerbation of a preexisting condition. Dr. Sullivan stated that treatment after November 1, 1996, could not be "substantiated as being curative or beneficial related to the motor vehicle collision that occurred on 09/10/96."

On July 15, 1997, Dr. Stavropoulos stated: "that there is preexisting degeneration disk disease with congenital block vertebra as outlined by Dr. Sullivan on cervical spine x-rays report, which probably has been aggravated by his 09/10/96 accident, and is causing increased cervical and left upper extremity discomfort."

On September 4, 1997, Dr. Stavropoulos reported: "[Humphrey] was advised that although his current symptoms arose out of the 09/10/96 auto accident regarding his cervical and upper extremity pain and paresthesias, his diagnosis is that of severe degenerative disk and facet disease . . . cumulative in origin and out of proportion to his age group, probably as a result of cumulative work injuries as a laborer, and particularly for the last 15 years as a custodian."

*Heart Attack*

Before his August 21, 1997, nonindustrial heart attack, Humphrey had no symptoms, no cardiac history and no cardiac-related work restrictions. He was hospitalized from August 21 to August 28, 1997. The diagnosis was a small inferior myocardial infarction and coronary artery disease with 100 percent obstruction of the right coronary artery and 90 percent obstruction of the circumflex artery.

On March 1, 1999, Humphrey's cardiologist, Dr. Woo, wrote that Humphrey was limited in what he could do physically as a result of the heart condition and totally disabled and unable to perform any type of physical labor.

*Apportionment*

Dr. Holmboe, after examining Humphrey and reviewing the records of the previous treating and consulting physicians, stated in his January 13, 1999 report:

"The patient's condition no doubt is permanent and stationary. The case is difficult because of the degree of degenerative change that is seen in the cervical and lumbar areas which probably has its origin not only in cumulative trauma but natural progression of an underlying disease process that is probably part of this man's heredity.

"Complicating this entire scenario is the fact that this man has had nonindustrial auto accidents and a lot of chiropractic treatment for his diseased spine and then an industrial aggravation to his low back while moving a freezer in 1997.

"Relating to the degree of degenerative changes that are seen, I have no doubt in my mind that at least part of the picture we see has been contributed to by cumulative trauma but I do not believe that all of it is. If it was, then we would be seeing this type of situation in almost everyone who did custodial work which is clearly not the case. I believe that this man has a propensity for developing spinal degenerative changes and I believe that a portion of his disability is related to the pathology created by the heredofamilial factors but contributed to by the effects of cumulative trauma over the years. I do not believe that all of the cervical picture, the cervical stenosis and the lumbar picture with the severe lumbar spondylosis are all related to his work. I would suggest to you that of his pathology which is creating his disability primarily in the neck, this is related to, in part, by cumulative trauma probably 50% and the other 50% being contributed to by heredofamilial factors and natural progression of an underlying disease process that was occurring anyway and also contributed to by two nonindustrial auto accidents. [¶] . . . [¶]

". . . Of his neck disability, I do not believe that more than 50% could be considered cumulative trauma and the remaining 50% related to his two auto accidents and natural progression. [¶] . . . [¶]

". . . I do not believe that more than 30% of that disability [lumbar spine] is related to the injury in August 1997 which has left him with more pain

than he had prior to that but I believe that clearly [70]%[2] of his problem is preexisting relating to his pathology which was contributed to by his auto accidents but, more importantly, his cumulative trauma. I would suggest that the remaining 70% of the disability would be evenly split between natural progression and nonindustrial factors and the other half to cumulative trauma. [¶] . . . [¶]

". . . Only insofar as his heart attack would limit him from strenuous things that would have an effect on the neck and back there would be overlap [of disability]."

On March 30, 1999, in response to a question concerning how Humphrey's heart attack affected the doctor's earlier comments about apportionment, Dr. Holmboe reported as follows: "This man is 100% disabled on a cardiac basis, so one has to wonder what difference it makes with his orthopaedic residuals if that is the case, other than perhaps the specter of treatment. I mentioned that he would have a preclusion from heavy work on his own orthopaedic aspects, but if he is 100% disabled, then there is no consideration for any type of restriction, although I previously indicated that the patient would be precluded from heavy work on the basis of his orthopaedic considerations. The comments I made about an award for further medical care for his hands would still apply and the fact that I believe that his disability for his cervical spine and lumbar spine remain unchanged, and if the patient [n]ever had a heart attack, he would still require those restrictions on the basis of his pathology and the symptoms that that pathology is producing and therefore creating disability."

## DISCUSSION

### I. *Apportionment*

#### A. *General Principles*

■ Permanent disability compensation serves the dual function of compensating the injured worker for the inability to work in the future and for the physical impairment of his or her body. (*Livitsanos v. Superior Court* (1992) 2 Cal.4th 744, 753 [7 Cal.Rptr.2d 808, 828 P.2d 1195]; *Western Growers Ins. Co. v. Workers' Comp. Appeals Bd.* (1993) 16 Cal.App.4th. 227, 235 [20 Cal.Rptr.2d 26].) There are, however, limits to the employer's obligation for permanent disability.

---

[2]The original report stated "75%," but that was later conceded to be a typographical error; it should have read "70%."

"Generally, an employer is held responsible in the workers' compensation system only for the disability of an injured employee arising from the particular employment with that employer, but not for disability fairly attributable to periods of employment elsewhere or to nonindustrial conditions. Apportionment is the process employed by the [WCAB] to segregate the residuals of an industrial injury from those attributable to other industrial injuries, or to nonindustrial factors, in order to fairly allocate the legal responsibility." (*Ashley v. Workers' Comp. Appeals Bd.* (1995) 37 Cal.App.4th 320, 326 [43 Cal.Rptr.2d 589].)

Apportionment is concerned with the disability, not its cause or pathology. (See *Duthie v. Workers' Comp. Appeals Bd.* (1978) 86 Cal.App.3d 721, 728 [150 Cal.Rptr. 530]; *Hart v. Workers' Comp. Appeals Bd.* (1978) 82 Cal.App.3d 619, 626-628 [147 Cal.Rptr. 384]; *Dorman v. Workers' Comp. Appeals Bd.* (1978) 78 Cal.App.3d 1009, 1018 [144 Cal.Rptr. 573]; *Bstandig v. Workers' Comp. Appeals Bd.* (1977) 68 Cal.App.3d 988, 997-998 [137 Cal.Rptr. 713].) The disability must be labor-disabling; it must interfere with work activity or place the worker at a disadvantage in the economic work force. (See 1 Hanna, Cal. Law of Employee Injuries and Workers' Compensation (2d rev. ed. 2000) § 8.01, pp. 8-5 to 8-6, § 8.06[1], p. 8-27.)

The burden of establishing the right to, and the proper proportions of, apportionment in a given case rests with the employer. (*Pullman Kellogg v. Workers' Comp. Appeals Bd.* (1980) 26 Cal.3d 450, 456 [161 Cal.Rptr. 783, 605 P.2d 422].) Apportionment, which raises issues of fact, cannot be based on speculation. (*King v. Workers' Comp. Appeals Bd.* (1991) 231 Cal.App.3d 1640, 1646-1647 [283 Cal.Rptr. 98].) The employer must produce substantial evidence which proves the proportion of the disability properly chargeable to nonindustrial factors. (*Ibid.*, citing 1 Hanna, Cal. Law of Employee Injuries and Workers' Compensation, *supra*, § 8.05[3], p. 8-26.) Such evidence most often takes the form of expert medical opinions from professionals familiar with the legal theories of apportionment under the workers' compensation scheme. (*Martins v. Workers' Comp. Appeals Bd.* (1995) 40 Cal.App.4th 1090, 1094 [47 Cal.Rptr.2d 386].)

Apportionment, like disability, considers the open labor market as compared to the worker's age, occupation, nature of physical injury or disfigurement, and ability to be rehabilitated. (*LeBoeuf v. Workers' Comp. Appeals Bd.* (1983) 34 Cal.3d 234, 243 [193 Cal.Rptr. 547, 666 P.2d 989]; 1 Hanna, Cal. Law of Employee Injuries and Workers' Compensation, *supra*, § 8.01, p. 8-6.) The level and extent of a worker's disability are determined by reference to the governing statutes, the administrative regulations and the

relevant case law. Under an authorization from the state Legislature, the Administrative Director of the Division of Workers' Compensation has adopted a schedule for rating permanent disabilities. (See Cal. Code Regs., tit. 8, § 9805). Physicians and other medical professionals who are familiar with the schedule often include its language or a paraphrase in expressing medical opinions. (1 Hanna, Cal. Law of Employee Injuries and Workers' Compensation, *supra*, § 8.02[4][a], p. 8-10.)

Apportionment is addressed primarily in three separate sections of the Labor Code. Two sections, 4750 and 4663, apply to antecedent injuries. Section 4750 relieves an employer from the burden of compensating an injured worker for disability attributable to a preexisting permanent disability or physical impairment. Section 4663 does the same when an injured worker's disability is partially attributable to a preexisting disease or condition. The third, section 4750.5, deals with subsequent injuries. Although FUSD argues that all three apply in this instance, the WCJ and WCAB found that none do. We will conclude that the evidence calls into play only section 4750.5.

B. *Section 4750.5*

1. *Introduction*

Section 4750.5 provides as follows: "An employee who has sustained a compensable injury and who subsequently sustains an unrelated noncompensable injury, shall not receive permanent disability indemnity for any permanent disability caused solely by the subsequent noncompensable injury."

FUSD contends that Dr. Woo's report of March 3, 1999, and Dr. Holmboe's comments on Humphrey's cardiac status provide substantial evidence that Humphrey was 100 percent disabled as a result of his heart attack and that, therefore, section 4750.5 relieved FUSD of all liability for permanent disability compensation to Humphrey. The WCJ concluded, relying on *Ashley v. Workers' Comp. Appeals Bd., supra,* 37 Cal.App.4th 320 (*Ashley*), that the statute was irrelevant under the particular facts because Humphrey's heart attack was a "condition" and not a subsequent "unrelated noncompensable injury" within the meaning of the statute.

The parties' respective arguments implicate two different aspects of section 4750.5—the phrase "unrelated noncompensable injury" and the last clause which includes the word "solely." ■ Faced with an issue of statutory interpretation, we are obliged to adopt a meaning for the language

in issue consistent with and promotive of the purpose of section 4750.5. (*Freedom Newspapers, Inc. v. Orange County Employees Retirement System* (1993) 6 Cal.4th 821, 826 [25 Cal.Rptr.2d 148, 863 P.2d 218]; *Select Base Materials v. Board of Equal.* (1959) 51 Cal.2d 640, 645 [335 P.2d 672].)

The section was enacted in 1983. (Stats. 1983, ch. 1160, § 1, p. 4390.) It was a direct legislative response to *Jensen v. Workers' Comp. Appeals Bd.* (1982) 136 Cal.App.3d 1042 [186 Cal.Rptr. 570] (*Jensen*). In *Jensen*, the applicant, a mechanic, sustained an industrial back injury and later reinjured his back while at home. The two injuries were clearly related, as the second aggravated the first, but only the first was work related. The issue in *Jensen*, therefore, was whether permanent disability compensation could be apportioned between an industrial injury and a *subsequent* noncompensable (nonindustrial) injury that substantially aggravated the earlier industrial injury. The medical opinions disagreed about the appropriate apportionment but concurred that at least a part of the permanent disability was *solely* the result of the nonindustrial injury. The WCJ ultimately apportioned the compensation equally between the two injuries and the WCAB affirmed.

On the worker's petition for a writ of review, the appellate court held that apportionment to the second nonindustrial injury was improper because it was not authorized under existing statutes. As the court saw it, neither section 4663 nor section 4570 could be read to include a subsequent disability. (*Jensen, supra,* 136 Cal.App.3d at pp. 1046-1047.) The court directed the WCAB to award the injured worker compensation for the entire disability, including that caused solely by the nonindustrial injury, without apportionment. The Legislature wasted little time in putting section 4750.5 in the Labor Code to provide the statutory authority *Jensen* found lacking. (See *Selected 1983 California Legislation* (1983) 15 Pacific L.J. 713.)

## 2. *"Unrelated noncompensable injury"*

FUSD raises no issue about the phrase "unrelated noncompensable injury," but Humphrey contends in part that it did not encompass his heart "condition."

*Ashley* is the only reported case to address the meaning of subsequent "unrelated noncompensable injury" in section 4750.5. In *Ashley*, the WCAB apportioned disability among industrial injuries which occurred at three different places of employment, a subsequent period of pregnancy, and an even later period of unemployment. The court held that an "unrelated

noncompensable injury" was an injury "clearly not occupationally related." (*Ashley, supra,* 37 Cal.App.4th at p. 329.) The court's analysis was as follows: " 'Subsequent' clearly means later in time than the injury which is subject to rating. 'Injury' is generally defined as 'hurt,' or 'damage,' or 'harm.' 'Noncompensable injury' may be defined by reference to what is considered a 'compensable injury' pursuant to the Labor Code. There is a comprehensive discussion of that term in *Livitsanos* v. *Superior Court*[, *supra,*] 2 Cal.4th 744, at pages 752-753. . . . 'The touchstone of the workers' compensation system is industrial injury which results in *occupational disability* or death. [Citations.] Labor Code section 3208 defines "injury" as "*any* injury or disease arising out of the employment . . . ." . . . Labor Code section 3208.1 ·describes "specific" injuries "occurring as the result of one incident or exposure *which causes disability or need for medical treatment*" and "cumulative" injury as "occurring as repetitive mentally or physically traumatic activities extending over a period of time, the combined effect of which *causes any disability or need for medical treatment.*" (Italics added.) Thus as the court in *Coca Cola Bottling Co.* v. *Superior Court* (1991) 233 Cal.App.3d 1273 [286 Cal.Rptr. 855] observed, "a compensable injury is one which causes disability or need for medical treatments." (*Id.* at p. 1284.) [¶] Moreover, the workers' compensation system is designed to compensate *only* for such disability or need for treatment as is occupationally related.' (Italics in original.)

"We conclude that the key distinction the Legislature intended to make in Labor Code section 4750.5 was between compensable and noncompensable injuries, rather than expanding the ordinary meaning of 'injury' to include a vast array of conditions and circumstances not usually relevant in apportionment. (If the Legislature had intended to include 'condition,' it would have said so.) We are persuaded that the Legislature merely intended that apportionment would apply only to noncompensable injuries, that is, those clearly not occupationally related. This careful distinction reflected legislative awareness of case law which does provide for compensability for subsequent injuries where the first injury is a substantial factor in causing the second nonindustrial injury. (See, e.g., *State Comp. Ins. Fund* v. *Ind. Acc. Com.* (1959) 176 Cal.App.2d 10, 16-17 [1 Cal.Rptr. 73].) Beyond this, it did not go." (*Ashley, supra,* 37 Cal.App.4th at pp. 328-329.)

This passage from *Ashley* was specifically cited by the WCJ in this case in deciding that section 4750.5 was not applicable to Humphrey. The WCJ reasoned that a "condition" such as Humphrey's heart problem was not an "injury."

Though we agree with the principles articulated in *Ashley,* we find its facts distinguishable. In *Ashley,* the employers were seeking apportionment for a

period in which the worker did not work because she was unemployed and pregnant, neither of which was a work-related injury or a disabling event covered by the compensation laws. A heart attack, on the other hand, is a disabling event, and, when it is work induced, is a compensable injury under the compensation scheme. (*King v. Workers' Comp. Appeals Bd., supra,* 231 Cal.App.3d 1640, *Greenberg v. Workmen's Comp. Appeals Bd.* (1974) 37 Cal.App.3d 792 [112 Cal.Rptr. 626]; *Moyer v. Workmen's Comp. Appeals Bd.* (1972) 24 Cal.App.3d 650, 657 [100 Cal.Rptr. 540].)

■ We therefore hold that "unrelated noncompensable injury" in section 4750.5 means a disabling event which, had it been work-related, would be compensable under the compensation laws. Though caused by a "condition," to wit, a cardiovascular disease process, a heart attack is an "injury" for purposes of section 4750.5. (*Ashley, supra,* 37 Cal.App.4th at p. 329.)

We find nothing in the statute which requires, as Humphrey alternatively argues, apportionment only when the subsequent injury involves the same body part as the earlier industrial injury. *Ashley* pointed out the obvious focus of the language of section 4750.5 as the distinction between a "compensable" and a "noncompensable" injury, and the opinion does not suggest the physical nature of the injuries in issue plays any role in the statute's application. The core inquiry under the statute is whether part of the permanent disability suffered by the claimant is attributable to something other than an industrial injury so as to make it unfair to saddle the employer with the economic responsibility for the entire disability.

### 3. *"Solely"*

■ According to FUSD, inclusion of the word "solely" in section 4750.5 means the Legislature wanted the total amount of the disability resulting from the subsequent injury to be set off against the amount of the disability resulting from the prior industrial injury. In this case, then, FUSD claims it should be relieved of paying further compensation to Humphrey because his heart attack was 100 percent disabling (i.e., 71 percent minus 100 percent equals a negative).

We cannot accept FUSD's position. We find it difficult to believe the Legislature intended to bestow on the employer, responsible to pay benefits for a prior industrial injury, the windfall of reduced or eliminated liability because the disabled worker suffered a later noncompensable disabling injury. Such a result would seem to be at odds with the paramount purpose

of the compensation law to provide benefits for work-related injury. (Cal. Const., art. XIV, § 4; *Safeway Stores, Inc. v. Workers' Comp. Appeals Bd.* (1980) 104 Cal.App.3d 528, 532-534 [163 Cal.Rptr. 750].)

We must presume the Legislature acted in a manner consistent with this overarching principle, and we therefore turn to concepts and standards ingrained in compensation law and practice in order to determine how the last clause of section 4750.5 should be implemented. "Solely" invites a comparison between the successive injuries and their resulting disabilities. Successive injuries and the apportionment of disability responsibility have long been regular fare for compensation lawyers and judges. Apportionment between preexisting industrial injuries and subsequent natural disease processes have been dealt with effectively within the administrative realm for decades. (1 Hanna, Cal. Law of Employee Injuries and Workers' Compensation, *supra*, § 8.05, pp. 8-19 to 8-27, and cases collected therein.) Similarly, the administrative process has become adept at apportioning responsibility between multiple employers, each of which may bear some responsibility for a worker's successive injuries and resulting disabilities over time and a series of employments. (*Ibid.*) We do not believe the Legislature intended to depart from these long-standing general principles governing the apportionment of sequential disabilities.

The basic rule has always been that, to the extent an old and a new related or connected disability overlap, there is no new disability to be compensated. (*Newman v. Workers' Comp. Appeals Bd.* (1984) 152 Cal.App.3d 219, 222-223 [199 Cal.Rptr. 422]; *State Compensation Ins. Fund v. Workers' Comp. Appeals Bd.* (1977) 70 Cal.App.3d 599, 605-606 [139 Cal.Rptr. 41]; 1 Hanna, Cal. Law of Employee Injuries and Workers' Compensation, *supra*, § 8.06[5][d], p. 8-36.) Therefore, to determine the permanent disability rating where one or more successive related compensable injuries exist, the disability rating of the earlier injury is subtracted from the disability rating of the later injury. (*State Compensation Ins. Fund v. Industrial Acc. Com.* (1963) 59 Cal.2d 45, 55 [27 Cal.Rptr. 702, 377 P.2d 902]; *Mercier v. Workers' Comp. Appeals Bd.* (1976) 16 Cal.3d 711, 716 [129 Cal.Rptr. 161, 548 P.2d 361].) The product of this arithmetic sets the disability rating for the later injury. For example, if the worker's first industrial injury resulted in a 60 percent permanent disability and his or her second industrial injury resulted in a 100 percent disability, the last disability must be rated at 40 percent disability. (See *Truck Ins. Exch. v. Industrial Acc. Com.* (1965) 235 Cal.App.2d 207 [45 Cal.Rptr. 178].) Or, if the earliest injury resulted in 100 percent disability, the later injury would not result in any further disability. (See *Bauer v. County of Los Angeles* (1969) 34 Cal.Comp.Cases 594, 597

[employee suffers two specific back injuries which leave him 100 percent disabled; later heart injury results in no disability because no further loss of earning capacity].)[3]

■ Neither the legislative history of section 4750.5 nor its language discloses an intention on the part of the lawmakers to abandon for the purposes of this statute alone the well-established rules governing the determination and calculation of multiple disabilities or to undermine the overriding goal of the compensation laws. In fact, the meager legislative history supports our construction of the statute. The thrust of these background materials is to the effect that the statute would ensure the application of prevailing rules about apportionment to both preexisting and subsequent disabilities. (See Sen. Republican Caucus Analysis, Assem. Bill No. 1987 (1983-1984 Reg. Sess.) Aug. 30, 1983; Sen. Democratic Caucus, Analysis, Assem. Bill No. 1987 (1983-1984 Reg. Sess.) Sept. 1, 1983; Analysis of Assem. Bill No. 1987, Sen. Com. on Industrial Relations (1983-1984 Reg. Sess.) July 6, 1983.)[4] FUSD has not explained why the outcome it proposes is compelled and has not called anything to our attention which shows the Legislature sought to bring about such a counterintuitive result.[5]

---

[3]Because independent disabilities are examined and rated separately, in some cases it is possible for an employee's total disability to exceed 100 percent if the separate disabilities are entirely unrelated. (1 Hanna, Cal. Law of Employee Injuries and Workers' Compensation, *supra*, § 8.07[2][b], pp. 8-40 to 8-41.) In these types of cases, the analysis is straightforward; each disability is rated after it is determined whether the injury is compensable. (*Newman v. Workers' Comp. Appeals Bd., supra,* 152 Cal.App.3d 219, 222; *Bauer v. County of Los Angeles, supra,* 34 Cal.Comp.Cases at p. 596.) Thus, 95 percent disability rating for a back injury is not impacted at all by a subsequent 10 percent disability rating for a lost finger. However, the disabilities must be truly independent of one another, without "overlap." (1 Hanna, Cal. Law of Employee Injuries and Workers' Compensation, *supra*, § 8.07[2][b], pp. 8-40 to 8-41.) There is overlap here, because Humphrey has lifting restrictions and may not engage in physical labor.

[4]An interesting component of the legislative history is a letter from a law firm, acting on behalf of FUSD, which states in part that under the statute "an employee who sustains a compensable injury and subsequently suffers an indirect injury not arising out of and in the course of employment, shall not receive worker's compensation for the combined disability, *but only for the disability resulting from the original compensable injury.*" (Walters et al., letter to Honorable Bill Lancaster, May 27, 1983, re Assem. Bill No. 1987, italics added.)

[5]We recognize that section 4750.5 operates only where there is at least one noncompensable injury. The inquiry, nonetheless, remains essentially the same as that presented by apportionment under sections 4663 and 4750—how should responsibility be allocated between two or more injuries when the disabilities caused by each interact in some way? This issue arises only when disabilities overlap.

### 4. *Conclusion*

The WCJ rated Humphrey's disability from his specific back injury and his cumulative back injury at 71 percent. FUSD does not challenge this rating other than to say it is subsumed by the later cardiac disability. Thus, even if Humphrey's disability from the heart attack is rated at 100 percent, only 29 percent can be said to be "solely" from the event and not compensable under section 4750.5. Because the injury giving rise to the second disability was not industrial, Humphrey cannot, and is not, receiving compensation for it. However, as stated in Dr. Holmboe's March 30, 1999 report, even if Humphrey had never had the heart attack he would have been partially disabled as a result of his cervical and lumbar pathology. In other words, the 71 percent of Humphrey's total disability was not "solely" the result of the cardiac injury. He is entitled to receive, and is receiving, compensation for this level of disability. ██ ██ For these reasons, the WCJ's decision was correct even though we read *Ashley,* and construe section 4750.5, differently than did the WCJ.[6]

### 5. *Other Considerations\**

. . . . . . . . . . . . . . . . . . . . . . . .

### C., D.\*

. . . . . . . . . . . . . . . . . . . . . . . .

## II. *Remaining Contentions\**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[6]It is of no import that we do not adopt the WCJ's reasoning. The scope of our review is not limited to an evaluation of the trial court's reasoning or the theory underlying its decision. An appellate court reviews judicial action, not judicial reasoning. (*El Centro Grain Co. v. Bank of Italy Etc.* (1932) 123 Cal.App. 564, 567 [11 P.2d 650]; *United Pacific Inc. Co. v. Hanover Ins. Co.* (1990) 217 Cal.App.3d 925, 933 [266 Cal.Rptr. 231] (*United Pacific*).) " '[I]t is what the court did, and not what the judge of the court stated . . . that determines the course of our inquiry upon this appeal, as there is a vital distinction between what the judge of a trial court may say and what the trial court actually does.' " (*Diaz v. Schultz* (1947) 81 Cal.App.2d 328, 332 [183 P.2d 717]; see also *United Pacific, supra,* 217 Cal.App.3d at p. 933.) If the ultimate result arrived at by the trial court is correct on any theory of the law relevant to the case, it must be affirmed. (*Davey v. Southern Pacific Co.* (1897) 116 Cal. 325, 329 [48 P. 117]; see also *City of National City v. Wiener* (1992) 3 Cal.4th 832, 850 [12 Cal.Rptr.2d 701, 838 P.2d 223]; *Green v. Superior Court* (1985) 40 Cal.3d 126, 138 [219 Cal.Rptr. 186, 707 P.2d 248].)

\*See footnote, *ante,* page 1295.

## DISPOSITION

The judgment (order) of the WCAB is affirmed.

Thaxter, J., and Wiseman, J., concurred.