Filed 5/13/14  P. v. Yip CA1/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>KA CHUNG YIP,<br><br>        Defendant and Appellant. | A133595<br><br> (San Mateo County<br> Super. Ct. No. SC072068C)<br><br>**ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br>[NO CHANGE IN JUDGMENT]** |

**THE COURT:**

It is ordered that the opinion filed herein on April 15, 2014, be modified as follows:

1.      Replace the text beginning with the second sentence of the last paragraph on page 10 ("Defendant points to evidence . . . .") up to and including the first sentence on page 13 ("Even if the issue were not forfeited . . . .") with the following:  "We disagree."  As modified, the last paragraph on page 10 continues onto page 13 and reads as follows: "Here, defendant claims the evidence was insufficient to support the court's conclusion that the discovery of marijuana-related debris justified the traffic stop.  We disagree.  The trial court had before it evidence that the police were engaged in an ongoing investigation . . . ."

2.      On page 13, in the sixth line, add as new footnote 1 the following immediately after the sentence that ends "as of late April 2009":

        [1] We do not suggest, as defendant claims, that evidence of marijuana cultivation at 61 Rockford "forever justifies searches of anyone seen on the

1

premises." There was an ongoing investigation of 61 Rockford, with officers visiting that address on multiple occasions, including on the date of the traffic stop. Consequently, it is reasonable to infer that the police would have been aware if conditions at 61 Rockford indicative of marijuana cultivation had changed. Further, as noted in one of the cases relied upon by defendant, *People v. Hulland* (2003) 110 Cal.App.4th 1646, 1652, evidence may not be considered stale if "the nature of the activity is such as to justify the inference that it will continue until the time of the search."

3.      Footnote 3 on page 17 is renumbered as footnote 2.

There is no change in the judgment.

The petition for rehearing is denied.


Dated: _____                    _____
                                                           McGuiness, P.J.

Filed 4/15/14  P. v. Yip CA1/3 (unmodified version)
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>   Plaintiff and Respondent,<br><br>v.<br><br>KA CHUNG YIP,<br><br>   Defendant and Appellant. | A133595<br><br>(San Mateo County<br> Super. Ct. No. SC072068C) |

Defendant Ka Chung Yip was convicted by a jury of unlawfully cultivating marijuana, possessing marijuana for sale, and stealing utility services.  On appeal, he contends the trial court erred in failing to suppress evidence obtained during a traffic stop.  He also contends the evidence was insufficient to support his conviction for utility services theft premised upon the existence of an electric meter bypass at a residence housing a marijuana grow operation.  Described by the prosecutor as "primarily labor" in the marijuana grow operation, defendant argues he did not control the operation or have any reason to know that an electric meter had been bypassed.  We agree that the evidence was insufficient to support defendant's conviction for theft of utility services.  Accordingly, we reverse that conviction but otherwise affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

In December 2008, a PG&E employee responded to a report of an electrical problem in Daly City.  The employee discovered that an electrical wire leading to two houses had melted.  The employee's investigation led him to suspect that a meter bypass was in place at 61 Rockford Avenue (61 Rockford).  A bypass diverts electricity around

1

the meter and allows the customer to receive electricity without charge. In the employee's experience, bypasses are often found at houses being used for cultivating marijuana. The employee reported his suspicion that a bypass was in place to his supervisor at PG&E.

In early 2009, the San Mateo County Narcotics Task Force (Narcotics Task Force) commenced an investigation of 61 Rockford. The lead investigator on the case traveled to 61 Rockford roughly once every two to three weeks from January until June 2009. An officer who was in the vicinity of 61 Rockford in January 2009 smelled a strong odor of marijuana emanating from the residence and heard a buzzing or humming sound coming from inside the house. A buzzing or humming sound is commonly associated with marijuana grow operations due to the use of fans inside of the home. Later in January 2009, officers conducted a traffic stop of a vehicle leaving 61 Rockford. The driver was identified as Mon Chan. A strong odor of fresh marijuana was coming from both Chan and the vehicle. Police found $4,500 in cash on Chan. The officer released Chan after the traffic stop and passed along the information he had learned to the Narcotics Task Force.

San Mateo County Sheriff's Deputy Daniel Guiney, a member of the Narcotics Task Force, participated in the investigation of 61 Rockford and occasionally drove by that address in early 2009. On April 28, 2009, he observed a commercial van backed into the driveway at 61 Rockford. Two men placed black plastic garbage bags into the back of the van before driving away. Deputy Guiney followed the van to a waste management site in Alameda County. He waited outside the waste site for about 10 to 15 minutes until the van left. He followed the van back to Daly City and saw it stop at a shopping center. While the van was at the shopping center, Deputy Guiney arranged for the Daly City police to conduct a traffic stop of the van.

A Daly City police officer conducted a traffic stop after the van left the shopping center. Defendant was driving the van but did not have a driver's license in his possession. The passenger identified himself as Menh Voong and provided

identification. The officer cited defendant for driving without a license and passed along the information about the van's occupants to Deputy Guiney.

After the traffic stop concluded, Deputy Guiney continued following the van and observed it returning to 61 Rockford. There, defendant and Voong loaded approximately 10 black plastic garbage bags into the van. The van then returned to the same waste management site in Alameda County that it had traveled to earlier. On this occasion, Deputy Guiney followed the van inside the facility and watched defendant and Voong place black garbage bags in an area behind the van. Deputy Guiney did not follow the van after it left but instead opened up three or four of the plastic garbage bags that were left by defendant and Voong. The bags Deputy Guiney opened contained waste material associated with marijuana cultivation, including wet or damp "Grodan" growing cubes that allow marijuana roots to spread, mylar paper, tape, hoses, soil, and empty plastic nutrient bottles. In the deputy's experience, all of these materials were consistent with waste produced in marijuana cultivation.

On June 9, 2009, members of the Narcotics Task Force were conducting surveillance of 61 Rockford beginning at approximately 5:45 p.m. A white van was parked in the driveway. A Honda arrived at the house at approximately 7:00 or 7:30 p.m. At about this time, the officers decided to execute a search warrant for 61 Rockford. At around 9:00 p.m., the white van drove away from 61 Rockford. About 10 to 15 minutes later, the Honda left and a Toyota drove out of the garage and left as well.

San Mateo County Sheriff's Deputy Leroy O'Laughlin, who was part of the surveillance effort at 61 Rockford, coordinated with Daly City police to stop the white van. After police stopped the van, O'Laughlin arrived at the scene and questioned defendant, who was driving the van. The van did not belong to defendant. Deputy O'Laughlin smelled a strong odor of marijuana coming from both defendant and the van. The strength of the odor led the deputy to conclude defendant had been tending marijuana plants. According to the deputy, simply being around marijuana is not enough to cause such a strong odor. Rather, making contact with marijuana, including cutting it, trimming it, or "something of that nature," is what caused the strong smell.

Deputy O'Laughlin removed defendant from the van and seized $728 in cash from either defendant's wallet or his person. The deputy also seized three cell phones. One was on defendant and the other two were found between the seats. One of the cell phones was an "LG Net10," a type of prepaid cell phone requiring no contract. The deputy described cell phones as a "tool in the trade" in the marijuana business, and stated that a seller may have multiple cell phones for different customers.

Meanwhile, other police officers conducted traffic stops of the Honda and Toyota. Voong was the driver of the Honda. Deputy Guiney helped search the Honda and seized numerous items from Voong and the Honda, including two cell phones, two garage-door openers, and multiple key rings and keys. One of the cell phones was an LG Net 10. One of the garage-door openers operated the garage door at 61 Rockford.

At approximately 1:00 a.m. on June 10, 2009, the Narcotics Task Force lead investigator arrived at 61 Rockford with a search warrant. The search of the premises revealed an extensive marijuana cultivation operation inside 61 Rockford. The combination living and dining area contained 126 marijuana plants along with lights, growing trays, tubs for liquid nutrients, and ventilation tubing. The room contained four 600 watt lights and ten 1000 watt lights. A bedroom contained an additional 349 marijuana plants that were either immature plants or germinating clippings. The room contained equipment similar to that in the living and dining area, including three 1000 watt lights. In the kitchen, police found various containers in which marijuana was drying. The lead investigator estimated that the marijuana in the kitchen weighed about 25 pounds, was almost ready to be sold, and had a value of approximately $2,000 to $3,000 per pound. Other rooms in the house contained material for cultivating marijuana.

The electrical bypass was located in a cutout in the drywall hidden behind plastic film that had been used to cover the windows. Officers had to pull back the film in order to see the bypass. According to a PG&E employee, the current subscriber at 61 Rockford had initiated electrical service in September 2006. Based on the length of service and the number of lights in the house, the employee estimated PG&E's loss as a result of the bypass at $79,004.71. The PG&E customer at 61 Rockford was identified as Elliot Ng.

4

While police were searching 61 Rockford, other officers performed a search of Mon Chan's home in Daly City. Chan was not home at the time but was apprehended in a van during the course of the search. The lead investigator searched Chan and his vehicle. He found $1,776 in cash in Chan's pockets as well as another $5,000 in the van. Chan also had an LG Net10 cell phone. Inside the home officers encountered a woman identified as Kathy Hoang. It was determined that the deed to 61 Rockford was in the name of Cindy Hoang. Officers also found $9,421 in cash as well as an electronic money counter, a digital scale, and a plastic shopping bag containing a small amount of marijuana.

The San Mateo County District Attorney filed a three-count information charging Chan, Voong, and defendant with unlawful cultivation of marijuana (Health & Saf. Code, § 11358), possession of marijuana for sale (Health & Saf. Code, § 11359), and theft of utility services valued at more than $950 (Pen. Code, § 498, subd. (d)). As to the utility theft charge, the information contained a special allegation that the value of the stolen electricity exceeded $65,000. (Pen. Code, § 12022.6, subd. (a)(1).)

Chan pleaded no contest to two counts of theft of utility services as charged in an amended information applicable only to him. In exchange for his plea, prosecutors dismissed the remaining charges against Chan.

The case against Voong and defendant was tried before a jury. Defendant testified in his own defense at trial. He claimed to have visited 61 Rockford on three occasions. According to defendant, the first such visit was on April 28, 2009, when his friend, codefendant Voong, asked him to help dump some garbage. Defendant claimed he did not enter the residence at 61 Rockford and did not see or smell any marijuana on that occasion. The second time defendant visited 61 Rockford occurred sometime between April 28 and June 9, 2009. He went there to pick up Voong and give him a ride to The Home Depot to purchase wood. According to defendant, the third and final time he visited 61 Rockford was on the date of his arrest, June 9, 2009. He arrived at around 6:00 p.m. He planned to go to dinner with Voong and then go drinking with a mutual friend.

Defendant claimed he did not enter the residence and waited for Voong in the garage at 61 Rockford for several hours until he finally departed to go to a restaurant.

A plainclothes officer who detained defendant purportedly told defendant that he had seen defendant at the dump site and had a video of that event. Defendant did not understand the reference to "dump" and asked for an interpreter or attorney. The officers ignored his request, according to defendant. He was handcuffed and told he smelled of marijuana. At one point, he told the officers that he had been to a gas station earlier in the day on June 9.

In rebuttal, the officer who detained defendant on the date of his arrest, Deputy O'Laughlin, testified that defendant "understood pretty well" their conversation. According to Deputy O'Laughlin, defendant never asked for an interpreter or counsel. Defendant was not handcuffed while the van was searched. When Deputy O'Laughlin asked defendant where he was coming from, defendant replied that he had been at a gas station. After the deputy told defendant he had just seen him leave 61 Rockford, defendant eventually admitted that he had been at that location. Although defendant initially denied knowing anything about marijuana at 61 Rockford, he ultimately admitted that there were marijuana plants in the house. According to Deputy O'Laughlin, he said nothing to defendant about a dump or a trash run.

The jury found defendant and Voong guilty of unlawful cultivation of marijuana, possession of marijuana for sale, and theft of utility services. The jury returned a finding of "not true" as to the special allegation that the utility theft exceeded $65,000.

The court suspended imposition of sentence and placed defendant on three years of supervised probation, with numerous conditions, including that he serve 90 days in county jail. This appeal followed.

## DISCUSSION

### I. MOTION TO SUPPRESS EVIDENCE OBTAINED DURING TRAFFIC STOP

Defendant contends the trial court erred in denying a motion to suppress evidence obtained during the traffic stop conducted on April 28, 2009. The traffic stop of the van defendant was driving allowed officers to identify defendant and connect him to the

6

marijuana-related waste that was disposed at a site in Alameda County. Defendant argues the police did not have reasonable suspicion to believe that the occupants of the van were engaged in criminal activity. Among other things, he contends the trial court based its decision on a mistaken factual assumption about the sequence of events leading to the traffic stop. He also asserts that the information about a marijuana grow operation at 61 Rockford was stale by the time the officers conducted the stop and there was no other basis to suspect that defendant was engaged in criminal activity merely because he was hauling garbage away from the residence. We reject these contentions for reasons we explain below.

## A.    *Background*

Before trial, Voong filed a motion to suppress evidence as well as a motion to dismiss the information. Voong claimed there was no warrant or lawful justification for his detention by police on April 28 and June 9, 2009. Defendant joined in codefendant Voong's motions.

At the hearing on the suppression motion, the parties stipulated that certain preliminary hearing testimony referred to in the prosecution's opposition brief would be considered as part of the evidence before the court.

The preliminary hearing testimony summarized by the prosecution established that a PG&E supervisor had notified the police in December 2008 that a large amount of power was being drawn by the residence at 61 Rockford. In January 2009 an officer observed that a front window at 61 Rockford was covered and had condensation inside. The officer knew based on his training and experience that windows on a house containing a marijuana grow operation are often covered to avoid detection and to help control the environment for the marijuana plants. The officer also explained that a marijuana grow operation generates heat and humidity. On the following day, the officer smelled the odor of marijuana and heard a constant humming or buzzing sound coming from 61 Rockford. The officer knew that commercial-sized fans were used to circulate the air at indoor marijuana grow operations. Another officer testified that he had observed condensation on one window at 61 Rockford and heard a buzzing or humming

7

sound coming from the residence on January 27, 2009.  An officer assigned to the Narcotics Task Force testified that he had observed blinds covering the windows and the strong smell of marijuana coming from inside 61 Rockford on several occasions between January and June 2009.

The preliminary hearing testimony of Deputy Guiney established that he saw a full-sized van backed into the driveway of 61 Rockford on April 28, 2009.  He followed the van from Daly City to a waste management site in Alameda County.  Deputy Guiney followed the van back to Daly City after it left the facility.  He saw two Asian males load more garbage bags into the van and then drive away.  He followed the van again to the same waste facility in Alameda County.  Deputy Guiney searched through garbage bags left by Voong and defendant at the waste management site after the second trip to that facility.  The bags contained waste associated with marijuana cultivation.  As characterized in the prosecution's opposition brief, the preliminary hearing testimony established that Deputy Guiney asked for a marked police car to conduct a traffic stop of the van after the second trip to the waste management facility.  Similarly, in the statement of facts submitted by Voong in support of his motion to suppress, he stated that law enforcement conducted a traffic stop "[a]s the van was returning from the second trip . . . ."

Despite the fact that both Voong's motion to suppress and the prosecution's opposition stated that the traffic stop was conducted *after* defendant and Voong returned from the second trip to the waste management facility, at the preliminary hearing Deputy Guiney testified that he "believed" the traffic stop was conducted after the first trip to the facility and *before* the second trip.  Consequently, if Deputy Guiney's recollection as expressed at the preliminary hearing was correct, the traffic stop was conducted before he searched the bags left at the facility by defendant and Voong that contained evidence of marijuana cultivation.

Additional testimony was offered at the suppression hearing.  One officer testified that he smelled a strong odor of marijuana and had heard a humming sound consistent with indoor fans when he was outside 61 Rockford on January 7, 2009.  Another officer

8

testified that he stopped a vehicle that left 61 Rockford shortly after midnight on January 19, 2009. The officer smelled the odor of marijuana from inside the car. A search of the vehicle resulted in the discovery of $4,500 in cash.

Deputy Guiney also testified at the suppression hearing, although his testimony was limited because the prosecutor sought to avoid repeating questions asked at the preliminary hearing. Deputy Guiney testified that, as of April 28, 2009, he "was aware of an ongoing investigation of a potential marijuana indoor cultivation operation at 61 Rockford." He stated he followed the van that defendant was driving from Daly City across a bridge to a disposal site in Alameda County. The trip took approximately 30 minutes. Although he mentioned that he asked police to stop the van after it returned to Daly City, he did not clarify whether the stop took place after he searched the garbage bags that were left in Alameda County.

In arguing that the stop was illegal, defense counsel did not explain why the evidence was insufficient to support a reasonable suspicion that defendant and Voong were engaged in criminal activity. Rather, the focus of the argument was on whether the officers properly limited the detention so as to quickly confirm or dispel their suspicion of illegal conduct. Defense counsel argued the stop was a "fishing expedition" that simply sought to identify the van's occupants without inquiring about the marijuana grow operation.

The trial court denied the motion to suppress, reasoning that the officer saw "evidence of criminal behavior in what he observed in the abandoned bags." The court explained that "it's entirely reasonable at that point to identify the persons in the van." The court also rejected the claim that the scope of the detention was improper, concluding that "it was a limited stop simply for the purpose of . . . finding out their identifications with no effort to search the vehicle or the people further."

9

**B.** *Analysis*

Defendant contends the court's factual findings are not supported by substantial evidence. He argues that the court erroneously concluded the traffic stop was ordered after Deputy Guiney searched garbage bags left by defendant and Voong that contained marijuana-related materials, when in fact the "record shows that this discovery took place *after* police stopped the van." Further, he asserts that the evidence available to police was insufficient to justify the traffic stop because the evidence of a marijuana grow operation at 61 Rockford was several months old at the time of the stop, and the mere fact that defendant drove a large distance to dump debris was not suspicious absent evidence that there were closer alternatives for disposing of trash.

Our review of the trial court's suppression ruling is governed by well settled principles. "[W]e view the record in the light most favorable to the trial court's ruling, deferring to those express or implied findings of fact supported by substantial evidence." (*People v. Jenkins* (2000) 22 Cal.4th 900, 969.) "The trial court's ruling may be affirmed if it was correct on any theory, even if we conclude the court was incorrect in its reasoning." (*People v. Durant* (2012) 205 Cal.App.4th 57, 62.) Further, we may consider a new theory on appeal to support or defeat a suppression ruling if the evidence supporting the theory was fully developed at the time of the ruling. (*Green v. Superior Court* (1985) 40 Cal.3d 126, 137–138.)

" 'A detention is reasonable under the Fourth Amendment when the detaining officer can point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity.' " (*People v. Hernandez* (2008) 45 Cal.4th 295, 299.)

Here, defendant claims the evidence was insufficient to support the court's conclusion that the discovery of marijuana-related debris justified the traffic stop. Defendant points to evidence suggesting that the stop was made before the evidence of marijuana cultivation activities was discovered by Deputy Guiney. The problem with defendant's contentions on appeal is that they were not raised in the trial court. Further, at the time of the suppression hearing, even defense counsel seemed to believe that the

10

stop was conducted after the second trip to the waste management facility and after Deputy Guiney had found evidence of marijuana cultivation. The written motion submitted by Voong, in which defendant joined, stated that the stop was made *after* the second trip. In addition, defense counsel stipulated to the prosecution's summary of the preliminary hearing testimony, which clearly stated the stop was conducted after Deputy Guiney opened the garbage bags left by defendant and Voong. Indeed, during the suppression hearing, defendant's counsel seemed to accept the sequence of events put forth by the prosecution. Instead of arguing that the stop was made before Deputy Guiney discovered the marijuana-related garbage left by defendant and Voong, defendant's counsel contended there was no reason to suspect that defendant and Voong were involved in the marijuana grow operation because the items seen by the deputy were simply paraphernalia associated with a marijuana grow rather than actual marijuana. Under these circumstances, the court can hardly be faulted for adopting stipulated facts that both sides seemed to accept as true.[1]

In *People v. Williams* (1999) 20 Cal.4th 119, 130–131, the Supreme Court held that a defendant must specify the grounds to suppress evidence to properly preserve the issue for appeal. Once the prosecution has offered a justification for a warrantless search or seizure, a defendant must "present any arguments as to why that justification is inadequate." (*Id.* at p. 130.) "[I]f defendants detect a critical gap in the prosecution's proof or a flaw in its legal analysis, they must object on that basis to admission of the evidence or risk forfeiting the issue on appeal." (*Ibid.*) "The degree of specificity that is appropriate will depend on the legal issue the defendant is raising and the surrounding circumstances. Defendants need only be specific enough to give the prosecution and the

---

[1]Further, contrary to defendant's contention, there was not overwhelming evidence presented at the preliminary hearing to establish that the stop was conducted before the second trip to the waste facility. At most, Deputy Guiney expressed that he "believed" the stop was made after the first trip to the waste facility. It is not surprising that the parties seemed to be mistaken about the sequence of events, because Deputy Guiney testified about the entire sequence of events, including the second trip to the waste facility and the search of the garbage bags, before he mentioned that he ordered a traffic stop of the van.

court reasonable notice. Defendants cannot, however, lay a trap for the prosecution by remaining completely silent until the appeal about issues the prosecution may have overlooked." (*Id.* at pp. 130–131.)

In this case, defense counsel did not properly preserve the issue for appeal. The focus of the objection to the stop at the suppression hearing was the manner in which the officer conducted the detention, not the factual basis for conducting the stop in the first place. Not only did defense counsel fail to specify an objection to the prosecution's factual basis for the stop, counsel actually agreed with that factual basis. Further, defense counsel did not argue or even suggest that the evidence of a marijuana grow operation was stale or that there was nothing suspicious about the distance defendant traveled to dispose of the marijuana-related debris. This lack of specificity deprived the prosecutor of an opportunity to present evidence or argument responding to defense counsel's objections. With regard to the sequence of events that preceded the traffic stop, an objection would have allowed Deputy Guiney to clarify his testimony and would have permitted the prosecutor to respond to the issue. As for whether there was current information about a marijuana grow operation or whether it was suspicious for defendant to travel across the San Francisco Bay to dispose of garbage bags, an objection would have allowed the prosecution to present responsive evidence.[2] Under the circumstances, defendant forfeited the claims he now raises on appeal for the first time.

---

[2]Notably, the prosecution was in a position to respond to these issues if they had been raised. In its opposition to the suppression motion, the prosecution made an offer of proof that an officer would testify that he observed conditions at 61 Rockford consistent with a marijuana grow operation in late March and mid-April 2009. The prosecution presumably would have offered this evidence at the suppression hearing if defendant had claimed there was no evidence of a marijuana grow operation at 61 Rockford after January 2009 until the date of the traffic stop in late April. Further, at trial an officer testified that a waste facility in San Mateo County was much closer to 61 Rockford than the waste facility in Alameda County where defendant traveled to dispose of garbage bags.

Even if the issue were not forfeited, we would still reject defendant's claim of error. The trial court had before it evidence that the police were engaged in an ongoing investigation of 61 Rockford after January 2009. By its nature, a marijuana grow operation is not a short-lived event, such as a single drug sale. Absent some indication that conditions had changed at 61 Rockford, it was reasonable to assume that the house was still being used as a marijuana grow operation as of late April 2009. Further, the events observed by Deputy Guiney—including the removal of large numbers of garbage bags and the long distance traveled to dispose of them—constituted articulable facts that, considered together with the evidence of a marijuana grow operation at 61 Rockford, provided objective evidence that defendant may have been involved in criminal activity. These activities were suspicious regardless of what was contained in the garbage bags. Consequently, we conclude there was substantial evidence to support a conclusion the traffic stop was justified by a reasonable suspicion that defendant was engaged in criminal activity. The trial court properly denied the motion to suppress.

## II.  SUFFICIENCY OF THE EVIDENCE SUPPORTING THEFT OF UTILITY SERVICES

Defendant next contends there was insufficient evidence to support his conviction for theft of utility services in violation of Penal Code section 498, subdivision (d). As we explain, we agree with defendant.

In assessing a challenge to the sufficiency of the evidence, we "must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, [any] rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People v. Davis* (1995) 10 Cal.4th 463, 509.) " 'Substantial evidence' is evidence which is ' "reasonable in nature, credible, and of solid value." ' " (*People v. Morgan* (2007) 42 Cal.4th 593, 614.) We must " 'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1237.)

Penal Code section 498 contains two essential elements to establish a theft of utility services. First, a defendant must have the intent either (1) to obtain utility services without paying the full charge, whether for himself or another, or (2) "to deprive any

13

utility of any part of the full lawful charge" for its services. (Pen. Code, § 498, subd. (b).) Second, acting with the requisite intent, the defendant must have "commit[ted], authoriz[ed], solicit[ed], aid[ed], or abet[ted]" one or more of the five acts listed in subdivision (b) of Penal Code section 498. The first four acts requires a specific action, such as diverting electricity, tampering with a meter or with property owned by a utility, or making a connection to utility services without the utility's consent. (Pen. Code, § 498, subd. (b)(1)–(b)(4).) There is no evidence that defendant either committed one of these acts or aided or abetted in their commission. Consequently, only the fifth theory of liability, set forth in Penal Code section 498, subdivision (b)(5), could apply to defendant. That subdivision provides for liability when, with the requisite intent, a person "[u]ses or receives the direct benefit of all or a portion of utility services with *knowledge or reason to believe* that the diversion, tampering, or unauthorized connection existed at the time of that use, or that the use or receipt was otherwise without the authorization or consent of the utility." (Pen. Code, § 498, subd. (b)(5), italics added.)

The statute also permits an inference that there is a violation of Penal Code section 498 when any meter on premises "*controlled* by the customer or by the person using or *receiving the direct benefit of all or a portion of utility services* obtained in violation of this section" has been "tampered with[] or bypassed so as to cause no measurement or inaccurate measurement of utility services." (Pen. Code, § 498, subd. (c), italics added.)

Here, there was no evidence that defendant either knew electricity was being stolen or that he intended to steal electricity. There was nothing to suggest defendant installed the meter bypass, was aware of its existence, or had any reason to know that electricity was being used without charge. The evidence at trial was that the meter bypass was hidden from view. Officers had to look under plastic film used to cover the windows to even see the bypass. It was undisputed that the electrical service customer was Elliot Ng and that the deed to 61 Rockford was in the name of someone identified as Cindy Hoang.

The People contend the jury could have reasonably inferred defendant was aware of the electrical bypass. The People reason as follows: "After all, the evidence showed

14

that the house was filled with fans, light hoods, high-wattage lights, ballasts, ventilation tubes, dehumidifiers and filters. A member of a marijuana-growing conspiracy would know that the operation took vast amounts of electricity to operate, and that they were not paying for all of it."

We agree that someone in defendant's position would have known or at least suspected the operation consumed a large amount of electricity. But it does not necessarily follow that someone in defendant's position would have reason to know the electricity was being stolen. Defendant did not own 61 Rockford and was not the utility customer at that address. He would not have any reason to know whether PG&E was charging the customer for the entire amount of electricity consumed at that address. Insofar as the People claim a participant in a marijuana grow operation would have reason to know that such operations steal electricity, they have failed to cite any evidence to support their claim. While it may be the case that a person who manages a marijuana grow operation would know or have reason to know that a meter bypass is in place, it is not necessarily the case that someone with a limited role in the operation would also have reason to know that the operation is stealing electricity.

The evidence at trial did not establish that defendant had a significant role in the operation. To the contrary, the prosecutor effectively admitted that defendant's role was limited. In closing argument, the prosecutor explained to the jury that a marijuana grow operation is a joint enterprise with "people who are principals and people who are players." The prosecutor described Mon Chan as the "money guy" who was the target of the investigation. Chan was also described as a "maintenance guy too" who was "benefitting more than anybody else." According to the prosecutor, "the distribution part, the sales part, the financing part, that definitely seems to be Mon Chan." The prosecutor described codefendant Menh Voong as "control and maintenance." Voong had control because he had the garage door opener that provided the only mode of access to the interior of 61 Rockford. As for defendant, the prosecutor stated, "Ka Yip seems to come in as primarily labor." The prosecutor emphasized that defendant participated in

15

"the maintenance aspect" of the operation. The prosecutor also stated it "is undisputed that Ka Yip did not have a key or garage door opener for 61 Rockford."

The People have failed to explain how someone with such a limited role in the operation should be charged with knowledge of the electrical bypass. Based upon the evidence presented at trial, there was insufficient evidence to support a finding that defendant knew or had reason to know of the electrical bypass.

Further, there was no evidence to support a finding that defendant intended to steal electricity. As support for this element of the offense, the People rely on the permissive inference allowed by subdivision (c) of Penal Code section 498. That subdivision of the statute permits an inference that a person intended to steal utility services if there was an electrical bypass present on the premises and the person who received the direct benefit of the services obtained by the bypass *controlled* the premises. (Pen. Code, § 498, subd. (c).) There is no dispute that there was an electrical bypass in place and that defendant effectively benefited from the bypass as a participant in the marijuana grow operation. The dispute is over whether defendant controlled the premises at 61 Rockford. Even the People acknowledge this is a "very close question."

Penal Code section 498, subdivision (a) defines certain terms used in the statute but does not define "control" as that term is used in subdivision (c). Control is defined as the "power or authority to guide or manage." (Webster's Collegiate Dict. (10th ed. 2001) p. 252, col. 1.) In this case, there was no evidence that defendant guided or managed the marijuana grow operation. He was described as a simple laborer in the operation. Indeed, when he was arrested, he did not even have a key or garage door opener that would give him access to 61 Rockford.

The People contend that defendant had control over 61 Rockford because he was part of a joint venture to grow and sell marijuana. According to the People, "[t]hat [defendant] was more than just a lowly hired hand with no authority over the venture is belied by his possession of the same contract-less cell phone in the possession of Voong and Chan." Further, the People argue that the jury could have reasonably inferred that

16

those involved a joint venture to cultivate marijuana "all have control over the location of the venture . . . ." We disagree.

Defendant's possession of a prepaid cell phone without a contract does not support an inference that he had control over 61 Rockford. Moreover, contrary to the People's characterization of the evidence, there was no evidence that such cell phones are a tool of the marijuana trade. Rather, the evidence was that cell phones in general are a tool of the trade. With regard to prepaid cell phones in particular, an officer testified that they are difficult to trace and can be easily replaced, but the officer did not state or suggest that the possession of a prepaid cell phone tends to show that the person who possesses the phone controls or directs a marijuana grow operation.

Furthermore, the mere fact that defendant played a role in a marijuana grow operation does not support an inference that he had control over the premises where the operation was conducted. One would not necessarily conclude that an employee has control over the premises where that employee works. In this case, the evidence simply does not support a conclusion that defendant was in a position to manage or direct what took place at 61 Rockford. Although the evidence may support a finding that defendant had some involvement in the marijuana grow operation, that conclusion does not necessarily support an inference that he intended to steal electricity or even had reason to know it was being stolen.

Accordingly, we conclude the evidence was insufficient to support defendant's conviction for theft of utility services.[3]

---

[3]In light of our conclusion, it is unnecessary to address defendant's remaining contentions that the court erred in instructing the jury with the permissive inference in Penal Code section 498, subdivision (c), or that the prosecutor committed misconduct by misstating the law as it applies to the inference.

17

## DISPOSITION

The conviction for theft of utility services (Pen. Code, § 498, subd. (d)) as charged in count three of the information is reversed. In all other respects, the judgment is affirmed. The matter is remanded to the trial court for resentencing and further proceedings consistent with this opinion.

_____
McGuiness, P.J.

We concur:

_____
Siggins, J.

_____
Jenkins, J.

18