[Civ. No. 20968.   Second Dist., Div. One.   Oct. 31, 1955.]

MARY M. BENNETT, Appellant, v. MELVIN H. PHELPS et al., Respondents.

Gary W. Sawtelle and John J. Hall for Appellant.

Hunter & Liljestrom and Kenneth H. Clausen for Respondents.

WHITE, P. J.—Plaintiff has appealed from a judgment for defendants in her action seeking damages bcause of the death of her daughter while riding in an automobile driven by the defendant Charlotte and owned by Charlotte's father, the defendant Melvin Phelps.

The first ground for reversal stated by appellant in her opening brief is that the evidence is insufficient to support the finding of fact that defendant Charlotte Phelps was not negligent.  Appellant's objections to that finding and findings contrary thereto proposed by her were filed in the trial court before the judgment had been rendered.

Appellant contends that the judgment must be reversed because the evidence establishes negligence on the part of Charlotte as a matter of law. She relies upon the decision in *Gray* v. *Brinkerhoff*, 41 Cal.2d 180, 183 [258 P.2d 834]. In the cited case, the defendant driver ran down a careful pedestrian who was more than half way across a marked cross walk. There was no conflict in the evidence and the judgment for defendant based upon the finding that the driver was not negligent was reversed on appeal. *Gray* v. *Brinkerhoff, supra,* is not authority for reversal of a judgment for defendant where there is conflicting evidence regarding the circumstances of the collision.

In the instant action, the only testimony of an eye witness was that of Charlotte. She lived in Puente, was 18 years and 1 month old, had a valid driver's license, and had been driving an automobile for about a year. She traveled the same road every week day. On November 14, 1950, she was driving her father's 1940 De Soto. It was in good mechanical condition. On the front seat beside her was the decedent, her cousin Geraldine Waterous, who was living in the home of the Phelps in Puente  Both girls attended junior college in Pomona, about 9 miles east of their home. On the day of the accident they left home about 7:30, proceeded to and turned east on Valley Boulevard. Decedent was studying for her German test. It was "raining slightly, just drizzling." The windshield wiper was running. They were due at school at 8 o'clock. Valley Boulevard between Puente and Pomona was then a three-lane highway. The accident occurred about 7:45, approximately ½ mile west of the village of Walnut.

Mrs. Prentiss testified that she was a Supervisor in the Health and Safety Education of the Los Angeles County Schools. She drove east on Valley Boulevard on the morning of November 14, 1950. It was "raining pretty hard." She remembers seeing Charlotte and the decedent pass her. She was a little late for school and was going around 40 miles per hour, or maybe a little more. The place where they passed her was probably more than half a mile from the place of the accident, maybe a mile. She did not see the accident but she heard a crash which she presumes was it. She remembers no one else passing her except one large truck which she believes passed her after the girls did. A man and a boy were at the scene of the accident when she stopped there. Also a truck headed east was stopped in the south

lane of Valley Boulevard opposite the spot where defendant's car had struck a tree on the north side of the boulevard. She does not recall seeing any westbound truck that morning until after she had arrived at the scene of the accident.

Dan Flemming, an apparatus engineer for the County Fire Department then stationed at Walnut, also drove east along Valley Boulevard on the morning of the accident. He passed Charlotte and decedent. He was then driving about 45 miles per hour and passed without changing his speed. Charlotte was then driving about 35 miles per hour. Soon after that, Flemming passed an oil tanker going east at approximately 25 to 30 miles per hour. It was then going slower than Charlotte had been, and just as he passed it he heard its gears being shifted for the slight grade. When he got to Walnut, he started to make a lefthand turn and had to wait for a big new Diesel oil tanker to pass. It was westbound, traveling 45 to 55 miles per hour. At that time the Diesel was in the north lane of Valley Boulevard. Flemming traveled that route often and he believed there was about 200-yard visibility from curb to curb from all points in the vicinity for one approaching and passing the site of the accident from the west. According to Flemming, as well as other witnesses, there were pepper trees along both sides of the boulevard, their branches almost met over it, and on the rainy day of the accident they hung lower than the tops of trucks traveling in the north or south lanes. The trees were trimmed about twice a year.

The photographs in evidence show a clear view of the site of the accident from 634 feet in each direction. The photographer who took the pictures and paced the distances testified that the minimum visibility from curb to curb was approximately 600 feet, for considerable distance when approaching the site of the accident from east or west.

By the collision on November 14, 1950, Charlotte had both her legs broken, received a blow and cut on her head, was rendered totally unconscious for 17 days, hospitalized for nine weeks, and kept in bed for five and one-half months. At the time of the trial in August, 1954, she testified that she had no actual memory of the accident and that her reading of the deposition the night before had not refreshed her recollection; that she did not know whether her testimony given in the deposition in January, 1952, was based upon her then actual memory or upon what she believed had happened from what her family and friends had told her.

The following testimony quoted from her deposition is the basis of appellant's contention that as a matter of law Charlotte was not free from negligence as found by the trial court.

"Q. Now, I wonder if you would just describe to us what happened in this accident? A. Well, I can't remember very clearly what happened, because it was so long ago, but I believe it was like this: I pulled out to pass a semi truck, therefore, I would be pulling out into the middle lane. While I was passing this truck, I saw another truck, another big truck, semi, coming down on me. I had either one choice or the other, to hit the truck or try and get out of its way since it didn't move for me, therefore, I pulled off the road. . . . I pulled off on my left. . . . or to the northerly side of Valley Boulevard. . . .

"Q. What do you mean by a 'semi'? A. A two section truck. It was like a gasoline truck.

"Q. Can you give us an estimate as to how long this semi was to which you referred, which you were passing? A. I couldn't judge the length of it.

"Q. Well, perhaps we could state it in car lengths or some term with which you would be more familiar than just feet. Is there any medium of expression of that distance that would make it easier for you to estimate the length of that vehicle? A. I would judge it close to two and a half to three car lengths.

.   .   .   .   .   .   .   .   .   .   .   .

"Q. Do you remember looking ahead of you at the time you started to pass it? A. Yes, I did.

"Q. And in what lane were you traveling at that time? A. I was in my own lane, the outer lane. . . . The southernmost lane of Valley Boulevard. . . .

"Q. And for how far ahead of you could you see the road, that is, Valley Boulevard, at that time? A. I thought that I had clear vision, before I passed the truck, about two hundred to two hundred and twenty-five feet.

"Q. And at that time, how fast, approximately, were you traveling? A. I was traveling approximately thirty miles an hour.

"Q. Do you remember the approximate speed of this semi that you set out to pass? A. About my speed, about thirty miles.

"Q. Did you speed up at all to pass it? A. Slightly, yes . . . maybe up to 35 miles an hour.

.   .   .   .   .   .   .   .   .   .   .   .

"Q. Did you get entirely past the semi that you set out to pass, the one going in the same direction you were? A. No, I did not.

"Q. Then how far along its length, if you can estimate, did you get at the time you swerved off the road. A. I was approximately in the middle.

"Q. Now, I believe you said when you looked two hundred and twenty feet down the road, that you had clear vision for that length? A. When I was passing the semi, my vision was cut down since I was moving over, further over into the middle lane.

"Q. At that time that you were actually abreast of this semi you were passing, how far did you have clear vision down Valley Boulevard at that time? A. Approximately I would judge about one hundred fifty feet.

"Q. And it was the fact that the road curved slightly that limited your vision further than that? A. Yes, also the fact that I was pushed further over and didn't have the breadth to look over from the end lane to the middle lane.

"Q. You swung to your left, then, into the middle lane to pass this semi, is that correct? A. That is correct.

"Q. And did you, all during the time you were in the act of attempting to pass that semi, remain in that middle lane? A. I did.

"Q. Where were you, that is, where was your car with relation to the semi you were attempting to pass, at the time you first noticed the vehicle moving in the opposite direction? A. I was approximately in the middle, about the middle of the length of the semi I was passing.

"Q. And that was the first time you recall seeing the semi coming at you in the opposite direction? A. That is correct.

"Q. And approximately how far was that semi coming at you in the opposite direction, about how far away was it from you at the time you were midway of the semi you were passing? A. At the beginning of my vision, which would be about one hundred fifty feet away. . . .

"Q. At that time, do you recall formulating an estimate of its speed? A. The only thing that I recall is that I noticed it was coming awfully fast on me.

"Q. Well, 'awfully fast' is a rather relative term. If you didn't formulate an estimate of its speed, you can say so, but if you did, we would like your best estimate. A. Well,

I would say it was going at least the extent of the speed limit, if not over it, fifty-five or sixty.

.  .  .  .  .  .  .  .  .  .  .  .

"Q. And in what lane was it traveling when you first saw it, this semi moving in the direction opposite to that which you were going? A. It was also coming down the middle lane.

"Q. Did you notice at that time any other cars on the highway at all besides your car and the two semis? A. No, I did not.

.  .  .  .  .  .  .  .  .  .  .  .

"Q. I believe you testified that you swung your car to your left or to the northerly side of Valley Boulevard, is that correct? A. That is correct.

"Q. Could you tell us approximately how far way the oncoming truck was from your car when you did that? A. I could not judge except that it was practically on top of me.

"Q. Well, would it be ten feet away from you? A. Possibly.

"Q. Would it be as far as twenty feet away from you? A. I don't believe so.

"Q. In other words, would it be fair to say it was between ten and twenty feet away from you when you swerved your car to your left or to the northerly side of Valley Boulevard? A. Yes. . . .

"Q. From the time you first saw the oncoming truck, did it get over into the northernmost lane or did it continue in the middle lane? A. It stayed in the middle lane.

.  .  .  .  .  .  .  .  .  .  .  .

"Q. Is this correct, that the highest speed that you estimate you attained while attempting to pass the semi moving in the same direction you were, was approximately thirty-five miles an hour? A. That is right, approximately, that speed.

"Q. It could have been a few miles per hour either way? A. That is right.

"Q. Would you have attained a speed during that time as high as, say, forty miles an hour? A. It is conceivable.

"Q. Could you have attained a speed during that time you were attempting to pass that vehicle, of say, forty-five miles an hour? A. I don't know. It is possible.

"Q. Is it possible that you attained a speed while you were attempting to pass that vehicle of as high as fifty miles an hour? A. I don't believe so."

Based upon Charlotte's testimony hereinabove quoted from

her deposition, appellant, in her opening brief, argues as follows:

"Since the truck was 38 to 45 feet long, it would take Charlotte 6 seconds just to reach the front of the truck. In 6 seconds, traveling at the speed of 35 miles per hour, or approximately 52 feet per second, the De Soto would cover a distance of over 300 feet. Yet, by her own testimony, Charlotte could see only 200 to 225 feet ahead of her when she first pulled out to pass the truck, and only 150 feet ahead of her when she was half-way alongside the truck she was attempting to pass.

"She stated that her vision was limited by the curve in the road and by her position in the middle lane as she was attempting to pass the truck.

"By this conduct, which was the proximate cause of the death of deceased, defendant Charlote Phelps showed a lack of reasonable care in attempting to pass a long trailer truck on a curve when her vision ahead of her was obscured. Her account of the accident is not only uncontradicted, but the only evidence of how the accident happened.

"Therefore, plaintiff submits that reasonable men can draw but one conclusion—that defendant Charlotte Phelps was negligent in operating the De Soto, which negligence was the proximate cause of the accident and the death of deceased."

Appellant has taken the position that the trial court was required to find that all of the estimates of speeds and distances given by Charlotte in her deposition were accurate. Appellant ignores the testimony of Mrs. Prentiss that Charlotte passed her when she was traveling about 40 miles an hour, and Dan Flemming's testimony that when he passed Charlotte she was driving about 35 miles an hour. Appellant, in her mathematical calculations by which she attempts to prove Charlottte's negligence, also ignores all the other and more convincing evidence that Charlotte had clear vision for over 600 feet instead of 200 to 225 as estimated by her. Appellant dismisses the photographs of the site of the accident by saying they were taken on a brighter day.

While Charlotte herself was the only eye witness to the accident who testified at the trial, there was other and highly conflicting evidence as to the character of the curve in the road at the site of the accident, and the speeds of the other automobiles, as well as the one Charlotte was driving.

Appellant also urges that ''When an automobile goes off the highway and collides with a stationary object, a tree in this case, such an accident does not ordinarily occur in the absence of someone's negligence. (*Druzanich* v. *Criley* (1942), 19 Cal.2d 439 [122 P.2d 53] ; *Goss* v. *Pacific Motor Co.* (1927), 85 Cal.App. 455 [259 P. 455].) . . .

''Accordingly, plaintiff submits that the doctrine of *res ipsa loquitur* applies in this case, and that plaintiff was entitled to an inference of negligence.''

■ Assuming, but not deciding, that the doctrine of res ipsa loquitur does not apply to the facts of this action, where the record contains evidence regarding the cause of the accident and the acts of the defendant Charlotte, as well as the reasons for those acts, the inference of negligence arising from the doctrine of res ipsa loquitur is merely additional conflicting evidence. (*Pellegrino* v. *Los Angeles Transit Lines,* 79 Cal.App.2d 40, 43 [179 P.2d 39] ; *Druzanich* v. *Criley, supra,* p. 444.)

It is not the province of an appellate court to reweigh the evidence or to resolve its conflicts. We must assume that the trial court has considered all the evidence before it, determined which witnesses are to be believed, explained all discrepancies and inaccuracies to its own satisfaction, and that the findings express the facts.

■ In the instant action, there is substantial evidence in the record supporting the challenged finding that Charlotte was not negligent.

There being no negligence on the part of the defendant, plaintiff is not entitled to recover damages. Therefore, the question as to decedent's status as a guest or a passenger in the automobile at the time of the collision need not be considered, and the trial court's failure to find thereon was not error.

The judgment is affirmed.

Doran, J., and Drapeau, J., concurred.