Filed 10/14/22  In re T.P. CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re T.P. et al., Persons Coming Under Juvenile Court Law. | B315586 |
| _____<br><br>LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>E.D.P. et al.,<br><br>    Defendants and Appellants. | (Los Angeles County Super. Ct. Nos. 20CCJP06360A-B) |

APPEAL from order of the Superior Court of Los Angeles County, Philip L. Soto, Judge.  Affirmed.

Benjamin Ekenes, under appointment by the Court of Appeal, for Defendant and Appellant Father.

Caitlin Christian, under appointment by the Court of Appeal, for Defendant and Appellant Mother.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Navid Nakhjavani, Principal Deputy County Counsel, for Plaintiff and Respondent.

———————————

Appellants E.D.P. (father) and N.Z. (mother) appeal a juvenile court order denying their requests to regain custody of their children T.P. and E.P. from respondent Los Angeles Department of Children and Family Services (the Department). They contend the court erroneously required them to provide statements to law enforcement in violation of their right against self-incrimination. We reject this argument because the court merely ordered the Department to arrange for the parents or their attorneys to "meet and confer" with the police and did not compel mother or father to provide testimony.

Father and mother also argue the juvenile court impermissibly conditioned unmonitored visits with the children on their willingness to provide statements to the police. We do not reach this issue because it is moot. After mother and father filed their appeals, the juvenile court granted them unmonitored visits.

Mother and father contend the juvenile court also erroneously conditioned the return of the children to their custody on their statements to the police and the outcome of a criminal investigation. The premise of this argument is simply not true. The juvenile court made no such order.

Finally, father and mother contend there was no substantial evidence to support the juvenile court's order and findings. After reviewing the record in the light most favorable to the Department, we reject this argument too.

## BACKGROUND

### 1. *The Family*

T.P. and E.P. were born in November 2018 and May 2020, respectively. E.P. was about six months old at the time of the incident which gave rise to this action.

Mother, father, and the children lived together in the back house of a two-home property. The children's maternal grandparents and aunt B.M. lived in the front house.

Until the Department interceded, mother was the primary caretaker of the children. She does not work outside of the home. When mother was not with the children, father or their maternal grandmother took care of them. About twice a month, one of mother's female cousins watched the children for about 30 minutes.

### 2. *E.P. Sustains A Serious Injury that Appears to be the Result of Abuse*

On November 26, 2020, mother went to the gym and left the children in the care of father. Before she left, mother put E.P. to sleep in a bedroom. When father was first interviewed by a social worker, he said the child was sleeping in mother and father's bedroom in the back house. But he subsequently told the police and a social worker that E.P. was sleeping in the maternal grandparents' bedroom in the front house. Father could not explain why he gave inconsistent statements.

When E.P.'s naptime ended, father went to check on him. According to father, when he went into the bedroom, E.P. was pale, gasping for air, and his eyes were rolling back. Father claims he shook the child "a little bit" while calling his name, but E.P. did not respond. Father then took E.P. to aunt B.M.'s

bedroom and started cardiopulmonary resuscitation. A family member called 911. Paramedics quickly arrived and took E.P. to the hospital.

At the hospital, the treating physicians determined that E.P. suffered from a subdural hemorrhage on the left side of his brain with old and new blood. Doctors Julian Hirschbaum, Hannah Gwin, Lana Vasiljevic, and Catherine DeRidder suspected the injury was caused by abuse.

When interviewed by a social worker, mother and father denied that E.P. had fallen or suffered from a traumatic event. Both parents failed to provide any explanation for E.P.'s injury. Both also denied that there was any domestic violence in their household. Shortly after her initial interview, mother contacted the social worker and stated that three months before the incident, E.P. was with her during an automobile accident, though he did not appear injured at the time.

Doctors Hirschbaum, Gwin, Vasiljevic, and DeRidder each opined that the parents' statements were not consistent with E. P.'s injuries. After conducting additional tests and consulting with a pediatric neuroradiologist, Dr. DeRidder concluded the injury was caused by an acceleration-deceleration event within 1-2 weeks of E.P. coming to the hospital, and that E.P. likely had a mild case of Shaken Baby Syndrome. Dr. DeRidder also asked child abuse pediatrician Dr. Philip Hyden to review the case. Dr. Hyden agreed with Dr. DeRidder's assessment.

### 3. *The Juvenile Court Assumes Jurisdiction and Orders Reunification Services*

On November 30, 2020, the Department obtained an emergency removal order from the juvenile court. The children were placed in the care of their maternal aunt V.M. and the

4

aunt's husband.  V.M. and her husband live in a different residence than the homes where mother, father, and the maternal grandparents reside.

On December 2, 2020, the Department filed a juvenile dependency petition against mother and father.  The Department alleged that E.P. and T.P. came within the jurisdiction of the court pursuant to Welfare and Institutions Code section 300,[1] subdivisions (a) and (b), which provide for jurisdiction when a child has suffered, or there is a substantial risk that a child will suffer, serious physical harm caused by a parent's intentional conduct or negligence.  The petition also alleged that the court had jurisdiction over E.P. pursuant to section 300, subdivision (e)(causing or failing to protect against severe physical abuse), and jurisdiction over T.P. pursuant to section 300, subdivision (j)(the child's sibling was abused or neglected).

On February 4, 2021, the juvenile court held a hearing on whether it should sustain the petition and assert jurisdiction over the children.  The Department asked the court to sustain the petition and deny the parents reunification services.  A reunification plan would not be "effective," the Department argued, because E.P. was clearly abused by someone within the family and father and mother failed to acknowledge any kind of abuse or responsibility.

The juvenile court sustained the petition, found all the counts true, declared the children dependents of the court, and placed the minors in the Department's custody.  The court also ordered the Department to provide the parents reunification

---

[1] Future statutory references are to the Welfare and Institutions Code.

services, including parenting, conjoint, and individual counselling. The court granted mother and father monitored visits with the children. It also granted the Department discretion to "liberalize" visits.

### 4. *The Parents' Efforts to Reunify with Their Children*

Both mother and father successfully completed a parenting training course. They also participated in family counseling with the children. Additionally, both parents received individual counselling; mother completed 10 sessions and father completed 6. But during counseling and in his conversations with social workers, father did not acknowledge having anything to do with E.P.'s injury. There is also nothing in the record indicating mother admitted that she or father had any responsibility for what happened to E.P.

### 5. *The Department's Assessment of the Parents' Progress and Written Recommendations to the Juvenile Court*

In a status review report and "last minute information" documents filed with the juvenile court for its consideration at the September 9, 2021, hearing, the Department acknowledged mother and father partially complied with their case plan and made substantial progress. But the Department also recommended that mother and father complete the Parents in Partnership program and father complete a fatherhood program. The Department further noted that the parents were receptive to its recommendations for additional services. Based on the recommendations of a clinician working with mother and father, the Department also advised the juvenile court that both parents

would benefit from services related to the children's adjustment to living with them again.

The Department requested the juvenile court to order that the children remain in its custody. It also asked the court to grant mother and father only monitored visitation.

The Department provided a host of reasons for its requests. Its main argument was that "[t]he parents are the primary caregivers of the children and they have failed to provide an explanation that justifies the injuries to the child, [E.P.], which could have resulted in the death of the child."

The Department also noted that the parents and their criminal lawyers had not cooperated with Jenny Sierra, a detective in the Special Victims Bureau of the Los Angeles County Sheriff's Department. This issue was discussed throughout the Department's submissions to the court. The Department stated that it was not "inclined" to recommend unmonitored visits until Detective Sierra completed her investigation.

Detective Sierra advised the Department of her repeated efforts to contact mother, father, and their criminal lawyers. She further stated the sheriff's department was not "seeking to arrest the parents" but wanted to provide them with resources so they "can become better parents." "Detective Sierra stated all she needs is for the parents to reach out and speak to her either along with their attorneys or their attorneys may speak to her." After expressing her frustration with the lack of response by the parents' criminal lawyers, Detective Sierra stated, "she will call or email these attorneys for further matters so that she may address the case files open for this family appropriately."

Shortly thereafter, Detective Sierra stated in an email to the Department that she "had not heard from the parents or the attorneys" and that she "had never had attorneys avoid communication before."  Detective Sierra indicated she could not "move forward without a statement from the parents or at least the attorneys."

**6.      *The September 9, 2021, Hearing and Order***

On September 9, 2021, the juvenile court held a six-month review hearing pursuant to section 366.21, subdivision (e).  The court admitted into evidence numerous reports and documents offered by the Department.  The court then asked for "brief arguments."

Mother, father, and the children asked the court to order the children to be returned to the parents' home.  They also argued that whether the parents spoke to Detective Sierra was irrelevant because the parents had a constitutional right not to talk to the police.

The Department emphasized four points.  First, the Department argued it was unable to contact father's therapist at Kaiser and could not "confirm whether father actually addressed the issues in therapy.  And these are extremely serious issues."

Next, the Department stated it believed the parents would benefit from the Parents in Partnership program and father would benefit from a "project fatherhood program."

The Department also addressed the "detective issue," which it found "extremely concerning" because the parents had "dodged throughout this entire case the truth" about E.P.'s injuries.  "[I]f the parents are unwilling to talk to the detective to close the criminal investigation," the Department argued, "then the Department is unable to say with any certainty that the parents

8

have actually remedied the situation which brought them before this court."

Finally, in a related point, the Department agued: "The abuser is still out there. And the abuser is likely one of the parents."

The juvenile court then orally made its ruling. "[B]ased on the evidence presented today," the court stated, it would "continue jurisdiction." The court found "there is still a substantial risk of detriment to the . . . children's safety if the children were returned to parents." The court further found the parents were in "partial compliance" with their case plan and that the Department had complied with its obligation to make reasonable efforts to return the children to their parents. The court then set a 12-month review hearing pursuant to section 366.21, subdivision (f).

The juvenile court also issued two directives. First, the court ordered father and mother to sign any waivers or releases necessary for the Department to get all reports and records relating to services they received. Second, the court stated: "And I'm ordering the Department to make arrangements for the parents and their attorneys to meet and confer with the investigating--criminal investigating agency for any statements that they want that will finalize the criminal investigation."

These oral orders were formalized in a written order entered that day. Father and mother both filed timely appeals of the September 9, 2021, order.

### 7.     *Post-Appeal Events*[2]

On November 2, 2021, mother and father attended a Parents in Partnership orientation.

On December 29, 2021, mother, father, a staff member of Parents in Partnership, caregiver V.M., a social worker, and others had a meeting to develop an action plan for the parents to obtain unmonitored visits with their children.

In January 2022, the parents' criminal attorney communicated with Detective Sierra and a sergeant in the sheriff's department. As of the writing of the Department's February 28, 2022, status review report, the criminal investigation remained open.

On March 10, 2022, the juvenile court held a 12-month review hearing pursuant to section 366.21, subdivision (f). In its order, the court denied the parents' request to return the children to their physical custody. The court, however, granted mother and father unmonitored visits and ordered the Department to provide them with additional reunification services. The court also directed the Department to seek records from Kaiser by subpoena if it did not provide the requested information.

## DISCUSSION

### I.     *The Juvenile Court Did Not Violate the Parents' Right Against Self-Incrimination*

Father and mother argue the juvenile court's order required them to provide statements to the police. They contend

---

[2]     On May 23, 2022, this court took judicial notice of three post-appeal documents.

10

this order violated their right against self-incrimination under the Fifth Amendment to the United States Constitution.[3]

The premise of this argument is incorrect. The Fifth Amendment protects an individual against " 'testimonial' communications of an incriminatory nature, obtained from the person under official compulsion." (*People v. Low* (2010) 49 Cal.4th 372, 390.) Nothing in the juvenile court's order required mother or father to make potentially incriminating statements to the police. Rather, the court ordered *the Department* to "make arrangements" for the parents and Detective Sierra to "meet and confer" regarding "any statements that they want."

This directive must be placed in context. There is abundant evidence in the record that the sheriff's department was willing to speak to the parents' lawyers in lieu of speaking to the parents themselves. We must assume the juvenile court "considered all the evidence before it." (*Bennett v. Phelps* (1955) 136 Cal.App.2d 645, 652.)

Moreover, whether the juvenile court erred in ordering the parents or their lawyers to meet and confer with the sheriff's department is moot because such communications have occurred. At this point, we cannot grant effective relief and we decline to exercise our discretion to resolve this issue on appeal. (*In re N.S.* (2016) 245 Cal.App.4th 53, 60.)

Father argues the appeal is not moot because the juvenile court's order "infected the subsequent 12-month review orders." He does not, however, explain how the March 10, 2022, order was

---

[3] In the absence of testimonial immunity, mother and father were free to refuse to provide statements to the police . (*In re Mark A.* (2007) 156 Cal.App.4th 1124, 1142.)

11

"infected." The order does not state anything about communications between the parents or their lawyers with the sheriff's department. There is thus no basis to conclude the juvenile court's meet-and-confer order is an ongoing concern.

## II. *The Parents' Argument the Juvenile Court "Conditioned" Unmonitored Visits and the Return of the Children on Their Statements to the Police and the Outcome of the Criminal Investigation*

Father argues the juvenile court violated his due process rights by "conditioning unmonitored visits and the children's return home on the parents providing statements to law enforcement and the outcome of the criminal investigation." Mother joins and adopts this argument.

After the juvenile court issued its initial orders regarding (1) the parents signing any necessary waivers and releases and (2) the Department arranging for the parents to meet and confer with the sheriff's department, it expressed its views about how it would consider future developments.

Referring to possible statements by the parents to the sheriff's department, the court stated: "If [the Department] got the statements, then if there's [no] specific risk that they can point to, I want the Department to go to unmonitored visits for the parents, at least for the two-year-old and start moving forward."

The juvenile court further stated:

"And I realize the children are young and that's why we have to take it a step at a time and a go slow approach. So we are going to give you six more months of services with modified visits once you provide all of this material.

"So this is an incentive for you to sign off immediately so they can get the papers from service providers; for you to meet with detectives as soon as you can so the Department can get statements from detectives about any involvement you may have in it.

"Now I understand the detectives have said, 'We don't plan on arresting anybody right now,' but they could change their minds. We don't know -- not if the investigation is still open-- which is what is being provided for the court from the [Department's] daily services log.

"But once these things are in the books, unless there's some specific evidence --something other than, 'We aren't sure what might happen.' That's not enough. The Department needs to get past that and show the family that they can trust them by giving them unmonitored visits and overnight visits when it's appropriate. But at least unmonitored visits."

After making these statements, the court orally pronounced its remaining orders, which were incorporated in its written order along with its two initial oral orders. While the juvenile court's statements about what it expected of the parents and the Department in the future perhaps assisted the parties in deciding how to proceed, the statements were not incorporated into the court's oral or written orders.

" '[I]t is what the court did, and not what the judge of the court stated during the course of the trial, that determines the course of our inquiry upon this appeal, as there is a vital distinction between what the judge of a trial court may say and what the trial court actually does.' " (*Diaz v. Shultz* (1947) 81 Cal.App.2d 328, 332 (*Diaz*); accord *Fresno Unified School Dist. v. Workers' Comp. Appeals Bd.* (2000) 84 Cal.App.4th 1295, 1311,

13

fn. 6 [quoting *Diaz*].)  The oral "deliberations" of the court are thus conclusively merged in its final order.  (*Diaz*, at p. 333.)  In other words, "a judge's comments in oral argument may never be used to impeach the final order, however valuable to illustrate the court's theory they might be under some circumstances." (*Jespersen v. Zubiate-Beauchamp* (2003) 114 Cal.App.4th 624, 633; accord *Diaz v. Professional Community Management, Inc.* (2017) 16 Cal.App.5th 1190, 1206 ["while a court's oral statements may be illustrative of its thinking, it is the court's written order that constitutes the ruling"]; *Collins v. Hertz Corp.* (2006) 144 Cal.App.4th 64, 77–78 [an oral discussion by the trial court is merely an informal statement of its views and not itself the decision].)

Here, the premise of mother and father's argument is wrong.  The juvenile court did not issue an *order* "conditioning" the children's return to the parents' custody on their statements to the police or the outcome of the criminal investigation.  Nor did it issue an order conditioning unmonitored visits with the children on those things.  Instead, the court merely expressed its views about various matters without incorporating those views in its final written order.  Because the parents' premise is without foundation, their argument collapses.

Additionally, as to unmonitored visits, the issue is moot.  In its March 10, 2021, order, the juvenile court granted mother and father unmonitored visits.

**III.** ***There was Substantial Evidence Supporting the Juvenile Court's Order and Findings***

        *a.*     *The juvenile court's rejection of the parents' request to regain custody of the children*

Section 366.21, subdivision (e)(1) provides that at the six-month review hearing, "after considering the admissible and relevant evidence, the court shall order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." The juvenile court made this finding with respect to T.P. and E.P.[4]

Mother and father argue that there was no substantial evidence supporting the juvenile court's order denying their request to return the children to their physical custody at the six-month review hearing.

"When the sufficiency of the evidence to support a finding or order is challenged on appeal, the reviewing court must determine if there is any substantial evidence, that is, evidence which is reasonable, credible, and of solid value to support the conclusion of the trier of fact. [Citation.] In making this determination, all conflicts are to be resolved in favor of the prevailing party, and issues of fact and credibility are questions for the trier of fact. [Citation.] In dependency proceedings, a trial court's determination will not be disturbed unless it exceeds

---

      [4]     The juvenile court made this finding under the higher clear and convincing evidence standard.

the bounds of reason." (*In re Ricardo L.* (2003) 109 Cal.App.4th 552, 564.)

In reviewing whether there was substantial evidence supporting the juvenile court's order, "we must keep in mind that the purpose of the reunification plan is 'to overcome the problem that led to removal in the first place.'" (*In re Mary B.* (2013) 218 Cal.App.4th 1474, 1483.) Here, the impetus that led to the removal of the children was the abuse of E.P. that almost killed the child and the failure of the parents to take responsibility or even acknowledge the child was abused. At the six-month review hearing, the juvenile court could have reasonably concluded the children were still in danger. Despite months of therapy, father and mother had not clearly acknowledged the abuse or taken any responsibility.

There was also evidence father and mother would benefit from additional services, including a Parents in Partnership program, a fatherhood program for father, and relocation readjustment services. Furthermore, the Department did not have complete information on father's counseling. Collectively, this was substantial evidence to support the court's order.

Father and mother argue: "A juvenile court order requiring the admission of abuse as a precondition to reestablishing a parent's visitation rights with his or her child violates the parent's Fifth Amendment right against self-incrimination." This is an overbroad and inaccurate statement. While a parent is free to stand on his or her Fifth Amendment right not to testify without testimonial immunity, the juvenile court "may legitimately require a parent to admit responsibility for wrongful acts as a condition to be fulfilled in therapy." (*In re Mark A.*, *supra*, 156 Cal.App.4th at p. 1142; accord *In re Jessica B.* (1989)

16

207 Cal.App.3d 504, 520–521; *In re the Welfare of J.W.* (Minn. 1987) 415 N.W.2d 879, 883.)

In any case, as explained, the juvenile court did not establish any preconditions in its order. Rather, it simply found that returning the children to their parents at the six-month review hearing would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the children. There was substantial evidence to support that finding.

### b. *The juvenile court's finding the Department provided reasonable services*

At the six-month review hearing, if a child is not returned to his or her parents, the juvenile court shall determine whether the Department provided reasonable reunification services to the parents (§ 366.21, subd. (e)(8)) and the "extent of the agency's compliance with the case plan in making reasonable efforts" to return the child home (§ 366, subd. (a)(1)(B)). The juvenile court found the Department satisfied these requirements.

Mother and father contend there was no substantial evidence to support this finding. They argue the Department failed to provide reasonable reunification serves because it did not exercise its discretion to permit unmonitored visits.

This argument is moot. As we have explained, the juvenile court granted mother and father unmonitored visits after they appealed the September 9, 2021, order.

### c. *The juvenile court's finding that father and mother made only partial progress*

At each review hearing, the juvenile court must determine the "extent of the progress that has been made toward alleviating or mitigating the causes necessitating placement" out of the home. (§ 366, subd. (a)(1)(E).) The juvenile court found here

17

that the parents' progress was "partial." Mother and father argue there was no substantial evidence to support this finding.

We reject this argument for reasons we have already explained. At the six-month review hearing, the parents had not completed all the programs recommended by the Department. Moreover, there was compelling evidence that someone in the parents' household abused E.P. but mother and father still failed to acknowledge this abuse or take responsibility for the harm E.P. suffered.

## DISPOSITION

The juvenile court's order dated September 9, 2021, is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>

TAMZARIAN, J.[*]

We concur:

RUBIN, P. J.                    KIM, J.

---

[*] Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

18